[Cite as *State v. Thompson-Shabazz*, 2017-Ohio-7434.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27155 |
| | : | |
| v. | : | T.C. NO. 14-CR-3732 |
| | : | |
| TABAREE L. THOMPSON-SHABAZZ | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___1st___ day of _____September_____, 2017.

. . . . . . . . . .

HEATHER N. JANS, Atty. Reg. No. 0084470 and MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorneys, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorneys for Plaintiff-Appellee

WILLIAM O. CASS, JR., Atty. Reg. No. 0034517, 135 W. Dorothy Lane, Suite 117, Kettering, Ohio 45429
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Tabaree L. Thompson-Shabazz was found guilty after a jury trial in the Montgomery County Court of Common Pleas of murder (proximate result of felonious assault) and felonious assault. The trial court found after a bench trial that he was a

repeat violent offender, a specification for each offense. The trial court merged the felony murder and felonious assault charges and specifications and sentenced Thompson-Shabazz to 15 years to life for the murder with an additional term of 10 years for the repeat violent offender specification, to be served consecutively.

{¶ 2} Thompson-Shabazz appeals from his conviction, raising four assignments of error. He claims that his conviction was based on insufficient evidence and against the manifest weight of the evidence, that the trial court erred in admitting statements he made while in police cruisers, that the trial court erred in admitting a call made by the victim to the police, and that the trial court erred in allowing evidence that the victim had accused him of theft and that he was arrested for theft. For the following reasons, the trial court's judgment will be affirmed.

### I. Factual and Procedural History

{¶ 3} In July 2014, Thompson-Shabazz was in a relationship with Sheila Gibson, and he lived with her at her two-story single-family home in Dayton. Thompson-Shabazz was known to drink alcohol, and on numerous occasions, Dayton police officers had driven an intoxicated Thompson-Shabazz to Gibson's home; several officers were familiar with both Thompson-Shabazz and Gibson.

{¶ 4} During the nighttime hours of Sunday, July 13, 2014, Officer Harry Dilley was driving an intoxicated Thompson-Shabazz to Gibson's residence, when he heard a report from another officer that Gibson's neighbors had not seen her or her dogs since Friday (July 11) and were concerned about her welfare. With Thompson-Shabazz seated in his cruiser, Officer Dilley made several unsuccessful attempts to contact Gibson. Eventually, Officer Dilley and other officers entered Gibson's home to conduct a welfare

check. They located Gibson, deceased, on her bed in her bedroom; Gibson had died from numerous blows to her head with an object. After a police investigation, Thompson-Shabazz was arrested for her murder.

{¶ 5} Initially, a grand jury issued a no true bill on the murder charge against Thompson-Shabazz. However, on February 6, 2015, Thompson-Shabazz was indicted for purposeful murder, felony murder (proximate result of felonious assault), and felonious assault. Later that month, Thompson-Shabazz was re-indicted on the same three charges, with the addition of a repeat violent offender specification for each count.

{¶ 6} Thompson-Shabazz subsequently moved to suppress evidence obtained from the residence, arguing that the evidence was the product of an unlawful initial entry into the home. He also sought to suppress statements that he made to police officers on the grounds that the statements were involuntary and obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court held hearings on the motion on three separate dates in June, July, and August 2015. On December 1, 2015, the trial court overruled the motion to suppress in its entirety.

{¶ 7} The charges were tried to a jury in June 2016; the repeat violent offender specifications were tried to the court. The jury found Thompson-Shabazz guilty of felony murder and felonious assault; it acquitted him of purposeful murder. The trial court correspondingly found Thompson-Shabazz guilty as to the repeat violent offender specifications for felony murder and felonious assault and not guilty of the specification as to purposeful murder.

{¶ 8} At sentencing, the trial court merged the felonious assault count into the murder and sentenced Thompson-Shabazz to 15 years to life in prison for the murder.

The court imposed an additional term of ten years for the repeat violent offender specification, to be served consecutively to the sentence for murder.

{¶ 9} Thompson-Shabazz appeals from his conviction, raising four assignments of error.   We will address them in an order that facilitates our analysis.

## II. Motion to Suppress Statements Made to the Police

{¶ 10} In his second assignment of error, Thompson-Shabazz claims that "the trial court erred when it admitted the Appellant's statements made while in the police cruiser." Thompson-Shabazz focuses on two sets of statements: (1) the statements made to Officer Nicholas Brienza in the early morning hours of July 13, 2014, and (2) the statements made to Officer Dilley during the nighttime hours of the same day.

{¶ 11} When ruling on a motion to suppress, " 'the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.' "   *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994).   We must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record*.   State v. Isaac*, 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994).   Accepting those facts as true, we then must determine as a matter of law, without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied.   *Id.*

{¶ 12} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself or herself.   In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only

after a showing that the procedural safeguards described in *Miranda* have been followed. *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21. To counteract the coercive pressure of custodial interrogations, police officers generally must warn a suspect, prior to questioning, that he or she has a right to remain silent and a right to the presence of an attorney. *Maryland v. Shatzer*, 559 U.S. 98, 103-104, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), citing *Miranda*.

{¶ 13} Even when *Miranda* warnings are not required, a defendant's statement may be involuntary and subject to exclusion. *State v. Zan*, 2d Dist. Montgomery No. 24600, 2013-Ohio-1064, ¶ 18. "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). A defendant's statement to police is voluntary absent evidence that his will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct. *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *State v. Otte*, 74 Ohio St.3d 555, 562, 660 N.E.2d 711 (1996).

*A. Statements Made to Officer Brienza*

{¶ 14} According to Officer Brienza, at approximately 1:20 a.m. on Sunday, July 13, 2014, he and other officers were on foot patrol in the Oregon District area of downtown Dayton, maintaining a safe area around the bars. Brienza was wearing a bike patrol

uniform. Brienza observed Thompson-Shabazz, who appeared to be "slightly intoxicated." Brienza had seen Thompson-Shabazz on two or three other occasions, and the officer had transported Thompson-Shabazz back to Gibson's residence once previously. Officer Brienza offered to give Thompson-Shabazz a ride home, and Thompson-Shabazz accepted. Brienza described the conversation as "very casual" and "lighthearted."

{¶ 15} Thompson-Shabazz sat (without handcuffs) in Officer Brienza's cruiser; the officer did not ask Thompson-Shabazz for information about his identity. After Brienza buckled Thompson-Shabazz's seat belt, the officer began to drive Thompson-Shabazz home. The officer asked for the location of the residence, and Thompson-Shabazz provided an intersection. Thompson-Shabazz started singing along to the country music that was playing in the cruiser, and the two men had a "very basic conversation" about Thompson-Shabazz's taste in music and their girlfriends/wives. As they continued driving, Thompson-Shabazz mentioned that his prior wife had been murdered. Officer Brienza did not ask any follow-up questions.

{¶ 16} The trial court found that Thompson-Shabazz's statements to Officer Brienza were admissible. It found that the interaction between the officer and Thompson-Shabazz was "casual and cordial" and that "[n]o police questioning occurred." The court found that Thompson-Shabazz made "spontaneous statements about country music and a previous wife that had been murdered." The trial court concluded that the statements during this encounter were not subject to exclusion because no police interrogation occurred; "All of Defendant's comments were voluntary, spontaneous declarations."

**{¶ 17}** We have reviewed the cruiser's recording of the interaction between Thompson-Shabazz and Officer Brienza, and we agree that Thompson-Shabazz's statements were not the product of custodial interrogation. " 'Interrogation' includes express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 20 (2d Dist.), quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "Interrogation" must reflect "a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300.

**{¶ 18}** "Police officers are not responsible for unforeseeable incriminating responses." *State v. Waggoner*, 2d Dist. Montgomery No. 21245, 2006-Ohio-844, ¶ 14; *Strozier* at ¶ 20. "A suspect who volunteers information, and who is not even asked any questions, is not subject to a custodial interrogation and is not entitled to *Miranda* warnings." *State v. Fair*, 2d Dist. Montgomery No. 24120, 2011-Ohio-3330, ¶ 39, citing *State v. McGuire*, 80 Ohio St.3d 390, 401, 686 N.E.2d 1112 (1997). In other words, "*Miranda* does not affect the admissibility of '[v]olunteered statements of any kind.' " *McGuire* at 401, citing *Miranda*, 384 U.S. at 478; *State v. Montgomery*, 2d Dist. Montgomery No. 23870, 2010-Ohio-5047, ¶ 15.

**{¶ 19}** Most of the statements made by Thompson-Shabazz while in Officer Brienza's cruiser were voluntary, spontaneous statements and not in response to any police questioning. Moreover, nothing in the casual conversation between Officer Brienza and Thompson-Shabazz involved a level of compulsion such that the officer

should have known that Thompson-Shabazz would likely make an incriminating remark in response. The trial court properly concluded that Thompson-Shabazz's statements to Officer Brienza were admissible.

*B. Statements Made to Officer Dilley*

{¶ 20} Several witnesses gave testimony related to the police officers' entry into Gibson's home on July 13, 2014, and the beginnings of the police investigation. Those witnesses included Officers Lindsay Warner, Officer Dilley, Officer James Campolongo, Officer Kyle Watts, and four of Gibson's neighbors. (Additional witnesses provided testimony related to other portions of Thompson-Shabazz's motion to suppress.) The State also presented the recording from Officer Dilley's cruiser. For purposes of Thompson-Shabazz's claim that his statements to Officer Dilley should have been suppressed, we focus primarily on the testimony of Officers Dilley and Warner and the cruiser video.

{¶ 21} By July 2014, Officer Dilley had had six or seven prior interactions with Thompson-Shabazz, mostly involving citations for drunkenness. Officer Dilley knew where Thompson-Shabazz lived (Gibson's residence), that Thompson-Shabazz had a relationship with Gibson, and that Thompson-Shabazz referred to Gibson as his wife. Thompson-Shabazz had previously advised Officer Dilley and other officers that a prior spouse and child had been murdered.

{¶ 22} At approximately 10:22 p.m. on July 13, 2014, Officer Dilley stopped Thompson-Shabazz due to an open container violation. Thompson-Shabazz was highly intoxicated, slurring his speech, smelling of alcohol, and having trouble walking. Upon inquiry by Dilley, Thompson-Shabazz said that he had no weapons and consented to a

pat down.  Officer Dilley placed Thompson-Shabazz, without handcuffs, in the cruiser so that the officer could drive him home; Thompson-Shabazz was not free to leave.  Officer Dilley cited Thompson-Shabazz for the alcohol violations and drove him to Gibson's residence; as they were driving, Thompson-Shabazz told Dilley that he no longer lived there.

{¶ 23} En route to Gibson's residence, Officer Dilley learned over the radio from Officer Lindsay Warner that Gibson's neighbors "were used to all the drama over there," but that they had not seen Gibson since Friday and were concerned about Gibson's welfare.  Warner asked Dilley to check if Gibson were "there and breathing."  After arriving at Gibson's home, Officer Dilley knocked on the front door and waited, but received no human response; dogs barked from inside.  Dilley knocked on the front door two additional times, waiting 30 seconds between each set of knocks.  There were lights on at the residence, but no one responded either time.  In addition to the neighbors' concerns, Officer Dilley knew Gibson to be overweight, causing him to have additional concerns for her health.

{¶ 24} After receiving no response to his knocks, Officer Dilley contacted Officer Warner over his radio.  Officer Warner told Officer Dilley that she had been flagged down by Gibson's neighbors, who had not seen Gibson since Friday and wanted the officer to go over and check on Gibson.  The neighbors had told Officer Warner that Gibson had filed theft charges against Thompson-Shabazz, that Thompson-Shabazz had gone to jail, and that they (the neighbors) were worried that Thompson-Shabazz had hurt Gibson after he got out of jail.

{¶ 25} Officer Dilley returned to his cruiser and asked Thompson-Shabazz where

Gibson was and when he (Thompson-Shabazz) had last seen her. Thompson-Shabazz responded that he had last seen Gibson "a couple days ago." Dilley next asked where he (Thompson-Shabazz) had slept the previous night; Thompson-Shabazz answered that he had slept on the front porch of the residence. In response to another question by Officer Dilley, Thompson-Shabazz indicated that he had "no keys" to the house. Dilley asked Thompson-Shabazz whether Gibson had been home then and when Thompson-Shabazz had last seen her; Thompson-Shabazz responded that he had last seen Gibson "yesterday" (Saturday) at 6:00 a.m.

{¶ 26} Officer Dilley returned to the house and continued knocking on the door. After a few minutes, he went back to the cruiser and asked Thompson-Shabazz for Gibson's telephone number. The officer's call to that number went straight to voicemail. Officer Dilley spent 20 to 25 minutes trying, unsuccessfully, to contact Gibson at the residence. Officer Warner, who had come to the scene following another call for service, was also concerned about Gibson's welfare; based on Warner's prior encounters with Gibson and Thompson-Shabazz, Warner knew that it was unusual for Gibson not to answer her door and that Gibson frequently spent time on her porch. Both officers had a growing concern for Gibson's welfare, and they asked other officers to come to the house. Officers Watts and Campolongo responded.

{¶ 27} Officers Dilley, Warner, Watts, and Campolongo walked around the property and found an unlocked window. An officer slid it open, and the officers yelled inside for Gibson; they received no response. Officer Dilley entered the residence through the unlocked window and then unlocked the front door to allow the other three officers to enter to assist in the welfare check. Officers Dilley and Campolongo

performed a protective sweep on the first floor as Officers Warner and Watt went upstairs. Officers Warner and Watts found Gibson's body upstairs. The officers left the residence and called for a supervisor.

{¶ 28} Thompson-Shabazz was later handcuffed and transported to the police station. Thompson-Shabazz had not been given *Miranda* warnings while he was seated in Dilley's cruiser outside of Gibson's residence.

{¶ 29} The trial court found that the statements that Thompson-Shabazz made in response to Officer Dilley's questions were admissible under the public safety exception to *Miranda*. The court reasoned, "This public safety exception to *Miranda* arises where there is an overriding need to save human life or rescue those in danger. Here, the custodial, non-Mirandized questions to Defendant in Officer Dilley's cruiser, limited in scope to assessing Ms. Gibson's status and whereabouts given the reasonable concern for her welfare, fall within the exigent circumstances exception." (Citations omitted.)

{¶ 30} We agree with the trial court that Thompson-Shabazz was not entitled to *Miranda* warning prior to his being questioned by Officer Dilley. "The public safety doctrine excuses compliance with *Miranda*, where exigent circumstances exist and where there is an immediate need to protect the general public, an individual person, or the officer involved." *State v. Luke*, 5th Dist. Stark No. 2003CA00413, 2004-Ohio-6137, ¶ 12. "Under the 'public safety' exception, a suspect's answers to questions from a police officer are admissible in the absence of a *Miranda* warning so long as the questions asked of the suspect are 'reasonably prompted by a concern for the public safety.' " *State v. Morgan*, 2d Dist. Montgomery No. 20987, 2005-Ohio-6542, ¶ 14, quoting *New York v. Quarles*, 467 U.S. 649, 656, 104 S.Ct. 2626, 81 L.E.2d 550 (1984).

{¶ 31} This court has repeatedly applied the public safety exception to permit police officers to question a suspect about the unknown location of a firearm, *e.g., State v. Brown*, 2d Dist. Montgomery No. 26035, 2014-Ohio-3257, as well as to permit officers to question an individual, prior to a pat down, about whether the individual might have something that could injure the officer, *e.g., State v. Hughes*, 2d Dist. Montgomery No. 25152, 2013-Ohio-808. Other appellate districts have interpreted the public safety situations to include when "there is an overriding need to save a human life or to rescue persons whose lives are in danger." *Luke* at ¶ 12; *see also, e.g., State v. Spence*, 12th Dist. Butler No. CA2002-05-107, 2003-Ohio-4237; *State v. Santiago*, 9th Dist. Lorain No. 01CA007798, 2002 WL 388901 (Mar. 13, 2002); *State v. Nitenson*, 4th Dist. Highland No. 796, 1992 WL 226325, * 3 (Sept. 9, 1992).

{¶ 32} In *Santiago*, for example, the police responded to the defendant's apartment, pursuant to a 911 hang-up call. After Santiago told the officers to come in, the officers found the defendant lying face down with his arms covered in blood. Santiago told the officers that he had just killed his girlfriend. When asked how, Santiago stated, "with a hammer." The officers placed Santiago in handcuffs and asked where his girlfriend was located; Santiago indicated that she was in the bathroom-kitchen area and nodded in that direction.

{¶ 33} On appeal, the Ninth District rejected Santiago's assertion that the trial court should have suppressed all statements that he made after the police entered the apartment. The appellate court concluded that the officers' questions "were clearly designed to secure their safety and the public's safety." *Id.* at *4. The court reasoned:

Officer Fairbanks first asked what happened, and Mr. Santiago responded

that he had just killed his girlfriend. At that point, the officers did not know if there were other people involved, who could still be in the apartment lying in wait, and did not know the type and location of weapon used, if any. Officer Fairbanks next asked who else was in the apartment. Mr. Santiago responded, "[j]ust my girlfriend. I just killed her." When asked how, Mr. Santiago stated, "with a hammer." Immediately after obtaining the information necessary to secure their own safety, the police placed Mr. Santiago in handcuffs. However, the police still did not know the actual condition of the victim and her location. As Ms. Yucka may still have been alive and in need of immediate medical care, it was important for the officers to find her as quickly as possible. Thus, the questions regarding the location of Ms. Yucka arose out of concern for the victim's safety and wellbeing. See *Taylor*, *supra*, at 5-6 (finding that questioning directed at locating the baby-victim justified the application of the *Quarles* exception to *Miranda*, as the baby may still have been alive and in need of care). Accordingly, we conclude that the questions asked by the police before he was handcuffed and the questions regarding the location of the victim shortly after he was handcuffed justified the application of the public safety exception to *Miranda* * * *.

*Santiago* at * 4.

{¶ 34} In the case before us, Officer Dilley was made aware while en route to Gibson's residence that neighbors of Gibson had told Officer Warner that there had been "drama" at the house, that they had not seen Gibson since Friday, and that their failure to

see Gibson was "very unusual." Officer Warner had asked Officer Dilley to check if Gibson was "there and breathing." Dilley knew Gibson was overweight and had health problems, and he knew that a prior wife of Thompson-Shabazz had been murdered.

{¶ 35} When he arrived at Gibson's house, the lights in the house were on and Gibson's dogs were inside. Dilley knocked on the front door three separate times, but received no answer. After Dilley's knocks met with no reply, he learned additional information from Officer Warner over the radio. Warner gave details to Dilley about how neighbors had flagged her down, that Gibson had filed theft charges against Thompson-Shabazz and that Thompson-Shabazz had gone to jail, and that the neighbors were worried that he had hurt Gibson after he got out of jail. At this point, the officers were very concerned about Gibson's welfare. Officer Warner testified that Gibson was "typically" outside on her porch and it was "very rare that she doesn't answer the door." The neighbors had also noted to Warner that Gibson had not collected her mail since Friday and they had not seen Gibson's dogs come outside.

{¶ 36} Officer Dilley's subsequent questions to Thompson-Shabazz were focused on determining where Gibson might be and when she had been last seen. Dilley asked Thompson-Shabazz where his wife was, when he had last seen her, where Thompson-Shabazz had slept on Saturday night and if Gibson had been home then. After Dilley again knocked on Gibson's door without any human response from inside, Dilley asked Thompson-Shabazz for Gibson's telephone number. The officer then tried to reach Gibson by phone, but the call went directly to voicemail.

{¶ 37} Officers Dilley and Warner reasonably believed that Gibson's life was in danger based on their prior knowledge of Gibson's typical behavior, the reports from

Gibson's neighbors, the presence of her dogs and lights on in the house, the mail in her mailbox, Gibson's failure to respond to Dilley's repeated knocks on her door, and Dilley's inability to reach Gibson by phone. Officer Dilley's questions to Thompson-Shabazz while Thompson-Shabazz was seated in the cruiser outside Gibson's home were directed to ascertaining Gibson's whereabouts and physical condition. Accordingly, the officer's questions fell within the public safety exception to *Miranda*, and the trial court properly denied Thompson-Shabazz's motion to suppress his responses to Dilley's questions on that basis.

{¶ 38} Thompson-Shabazz's second assignment of error is overruled.

### III. Sufficiency and Manifest Weight of the Evidence

{¶ 39} In his first assignment of error, Thompson-Shabazz claims that his conviction was based on insufficient evidence and was against the manifest weight of the evidence.

{¶ 40} A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 41} In contrast, an argument based on the weight of the evidence "challenges the believability of the evidence and asks which of the competing inferences suggested

by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 42} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 43} The State presented 20 witnesses at trial: the Montgomery County deputy coroner, two of Gibson's neighbors, a forensic scientist at the Miami Valley Regional Crime Lab, nine Dayton police officers, the booking sergeant at the Montgomery County Jail, an acquaintance of Thompson-Shabazz, three individuals who made threatening

phone calls to Gibson, a church pastor, and a volunteer at the same church. Through their testimony and exhibits, the State presented the following case against Thompson-Shabazz.

**{¶ 44}** On Wednesday, July 9, 2014, Gibson called the police to report a theft, and Officer Mark Gundelfinger responded to Gibson's house. Gibson told Gundelfinger that her "ex-boyfriend," Thompson-Shabazz, had stolen a money order out of the mailbox. Gibson indicated that she and Thompson-Shabazz were no longer in a relationship and that he had moved out. Officer Gundelfinger made a theft report and put out a "broadcast" with Thompson-Shabazz's information for other officers. Gunderfinger testified that a sergeant would go over the broadcast list at the beginning of the work shift.

**{¶ 45}** On the morning of Thursday, July 10, 2014, Officer Gregory Paxton heard Thompson-Shabazz's name listed when his sergeant read off the names of suspects wanted for crimes from the previous night. Paxton had "dealt with [Thompson-Shabazz] over the years many times," and the officer "made a mental note" of the broadcast as he went on patrol.

**{¶ 46}** Approximately an hour later, Officer Paxton encountered Thompson-Shabazz, and the officer placed him under arrest based on the broadcast; Paxton told Thompson-Shabazz that Gibson had made a theft report against him. When Paxton began to pat down Thompson-Shabazz, Thompson-Shabazz stated that the money order was in his left pocket and that he was in the process of returning it to Gibson. Paxton gave the money order to another officer (Officer Fogle) and asked Fogle to return it to Gibson. Paxton placed Thompson-Shabazz in his cruiser and transported Thompson-Shabazz to jail.

{¶ 47} According to Sergeant Scott Chapman, the booking sergeant supervisor at the Montgomery County Jail, Thompson-Shabazz was booked into the jail at 8:36 a.m. on July 10, 2014. He was released at 1:10 p.m. on Friday, July 11, 2014.

{¶ 48} William Lilly, Jr. ("Lilly"), Gibson's next-door neighbor, and his mother, Faith Lilly ("Mrs. Lilly"), who also lived in the neighborhood, both testified about their interactions with Gibson and Thompson-Shabazz on July 11-13, 2014. Lilly stated that, in July 2014, he saw Gibson "probably every day." He indicated that, when the weather was nice, she would be outside in her yard or at the store. He testified that Gibson had dogs that she let out regularly.

{¶ 49} On Friday, July 11, 2014, Lilly was outside setting up for his daughter's birthday party, which was scheduled for the next day in his backyard. While Lilly was setting up, Gibson was outside doing yard work. Lilly stated that at approximately 5:00 to 5:30 p.m., he saw Thompson-Shabazz enter Gibson's backyard from the alley behind Gibson's property, using a gate in the yard's fence. Lilly heard Thompson-Shabazz and Gibson begin to argue; Gibson and Thompson-Shabazz went inside Gibson's home when their voices became raised.

{¶ 50} At approximately 10:30 p.m., Thompson-Shabazz came over to the fence between Gibson's and Lilly's properties and asked Lilly for a cigarette. He also asked to use Lilly's phone so that he (Thompson-Shabazz) could call Gibson's phone in an attempt to locate it. Lilly told Thompson-Shabazz that his (Lilly's) phone was dead. Thompson-Shabazz went back into Gibson's house. Lilly did not see Gibson again that evening, but he testified that he heard Thompson-Shabazz and Gibson yelling "off and on" until approximately 11:30 p.m. Lilly saw Thompson-Shabazz leave Gibson's house around

11:30 p.m., approximately 30 minutes before Lilly left his own home to visit a friend's house. Lilly returned home at approximately 3:00 a.m.; he saw no further signs of activity at Gibson's home that night.

{¶ 51} On Saturday, July 12, Lilly went outside at approximately 9:00 a.m.; his daughter's outdoor party began around 1:00 or 2:00 p.m. Lilly did not recall seeing anyone at Gibson's residence throughout Saturday; he testified that he would have expected to see Gibson, because it was a beautiful day and she had dogs.

{¶ 52} Lilly saw the police drop off Thompson-Shabazz at Gibson's house at approximately 1:30 a.m. on Sunday morning (July 13). According to Lilly, Thompson-Shabazz hung out on Gibson's porch for a minute and then left the residence as soon as the police cruiser drove away. Lilly did not recall hearing Thompson-Shabazz call for Gibson before leaving. Lilly did not see any additional activity at Gibson's residence for the rest of day on Sunday, even though it was "another nice day." He did not see Gibson's dogs or see anyone coming or going. Lilly talked with his fiancée and parents about Gibson's absence. That night, Lilly's parents flagged down a police officer who was driving by to ask the officer to check on Gibson's welfare; Lilly was aware that Gibson had problems with her heart. Neither Thompson-Shabazz nor Gibson had a car.

{¶ 53} Mrs. Lilly (Lilly's mother) testified that she has lived in that neighborhood for 24 years, and works on a rental house (owned by another family member) across the street from Gibson's residence. Mrs. Lilly met Gibson when Gibson and Thompson-Shabazz moved into the house next to her son.

{¶ 54} Mrs. Lilly testified that she spoke with Gibson at 6:30 or 7:00 p.m. on Friday, July 11, when Gibson was on the porch and her dogs were outside. Mrs. Lilly testified

that she saw Thompson-Shabazz return home at approximately 8:00 or 8:30 p.m, when he came through the front gate from the street. Thompson-Shabazz and Gibson began to argue, and Mrs. Lilly stated that the two went inside when they were getting loud; Mrs. Lilly never saw Gibson outside again. Mrs. Lilly saw Thompson-Shabazz later that evening, when Thompson-Shabazz talked with her son and moved a lawnmower before going back inside his residence.

{¶ 55} Mrs. Lilly testified that she was at her son's home on Saturday, July 12, for her granddaughter's birthday party. She did not see Gibson or Gibson's dogs, which concerned her. Mrs. Lilly stated that no one had brought in Gibson's mail, and that it was Gibson's habit to bring in her mail as soon as it arrived. Mrs. Lilly left her son's home at approximately 9:00 p.m., and she did not see anyone come or go from Gibson's home prior to that time.

{¶ 56} Mrs. Lilly worked on the rental home across from Gibson's residence on Sunday, July 13. She noticed that Gibson's mail was still in the mailbox and that Gibson was not outside, causing Mrs. Lilly to be very concerned about Gibson. Mrs. Lilly was at the rental all afternoon and evening, and did not see Gibson or her dogs at any point. Later that evening, she flagged down a police officer who was driving by to express her concerns about Gibson.

{¶ 57} Officer Brienza testified about his encounter with Thompson-Shabazz in the early morning of Sunday, July 13. He described how he was on "bar detail" in the Oregon District, and he saw a slightly intoxicated Thompson-Shabazz, who appeared to be bothering people. Officer Brienza gave Thompson-Shabazz a ride home, during which they had a "casual conversation." Along the way, Thompson-Shabazz pointed out to

Officer Brienza the location where Thompson-Shabazz's prior wife had been killed. The jury viewed the cruiser video of Officer Brienza's driving Thompson-Shabazz home. The video ended while Officer Brienza was encouraging Thompson-Shabazz to go up to his house. Officer Brienza testified that Thompson-Shabazz was sitting on the porch when he drove away.

{¶ 58} Officers Warner and Dilley testified about the events on the night of July 13, leading to the discovery of Gibson's body and the beginning of the police investigation. Officer Warner testified that she had encountered Thompson-Shabazz three or four times prior to July 13, 2014; Thompson-Shabazz was intoxicated during each encounter. Warner also testified that she was familiar with Gibson. Warner testified, "On a couple occasions when we had picked up Mr. Shabazz, we would take him home for being intoxicated, and she [Gibson] would be the one at the home that would answer the door and let him into the home." Warner stated that, apart from those occasions, Gibson "would normally be on the porch or in the yard with her dogs outside of the home" when the officer patrolled the area.

{¶ 59} Officer Warner testified that, as she was on her way to another call (an unrelated custody matter) on July 13, 2014, a man and a woman who were neighbors of Gibson flagged her (Warner) down and told her that they had not seen Gibson since Friday. The neighbors had expressed that they were concerned that Thompson-Shabazz "may have hurt her when he got out of jail." The neighbors had pointed out that Gibson had not let her dogs out or checked her mail, and they wanted Warner to do a "well check" on Gibson. Warner testified that she contacted the dispatcher and let other officers know about the request.

{¶ 60} Officer Dilley testified that he encountered an intoxicated Thompson-Shabazz during the nighttime hours of July 13, 2014; Dilley was familiar with Thompson-Shabazz and had issued citations to him several times before. Dilley placed Thompson-Shabazz in his cruiser and drove him to his residence, where he tried to make contact with Gibson. Officer Dilley had met Gibson before at the house. Officer Dilley testified that, after Gibson did not answer the door, he (Dilley) talked with Thompson-Shabazz about Gibson's and his (Thompson-Shabazz's) whereabouts and the officer got Gibson's phone number from him.

{¶ 61} Warner's custody call took an hour and 45 minutes, and when she "cleared the call," she was told by the dispatcher that Officer Dilley was on his way to Gibson's residence. Warner testified that she contacted Dilley and explained what she had been told by the neighbors, and she went to the residence, arriving at 10:45 p.m. When she arrived, Thompson-Shabazz was in the back seat of Dilley's cruiser, and Dilley had already knocked on Gibson's door, without a response. Warner testified that she and Officer Dilley checked to see if there were any unlocked doors; there were not. Dilley got Gibson's phone number and attempted to call her, but the call went straight to voicemail. Officer Dilley contacted Officers Watts and Campolongo and asked them to come to the scene.

{¶ 62} The jury viewed a video from Officer Dilley's cruiser of the drive to Gibson's house and the time that the officers were trying to contact Gibson; the officers' actions are not seen, but the recording includes audio of their conversations. Throughout the time that Thompson-Shabazz was seated in Dilley's cruiser while it was parked at Gibson's residence, Thompson-Shabazz repeatedly asked, "Where's my girl at?" After

Thompson-Shabazz provided Gibson's phone number to Officer Dilley, Thompson-Shabazz can be heard to say something, which Dilley testified was "My girl got murdered, yo, once again." Dilley was aware that Thompson-Shabazz had a wife that had been murdered previously.

{¶ 63} After Officers Watts and Campolongo arrived, the officers decided to enter the house. Warner testified, "We were concerned that she [Gibson] could be in immediate danger inside the home, that she had been harmed. There -- it was just very out of character that she was not answering the door. The majority of the lights were on inside the home. The dogs were barking. We could not hear any human noises inside the home. And it was just extremely odd that - the way that things were turning out that evening."

{¶ 64} The officers found an unlocked window in the front of the house. With the assistance of Officers Watts and Campolongo, Officer Dilley climbed through the window and unlocked the front door for the other officers. Officers Warner and Watts went upstairs to the second floor, while Officers Dilley and Campolongo stayed on the first floor. Officer Watts entered the room on the right at the top of the stairs and told Officer Warner that he had found Gibson.

{¶ 65} Officer Warner informed Officers Dilley and Campolongo that she and Officer Watts had located Gibson, and the four officers exited the home. The officers contacted a sergeant, put up crime scene tape, and started a crime scene log.

{¶ 66} Sergeant Michael Godsey, supervisor of the Forensic Services Unit, was filling in for the homicide supervisor during the weekend of July 11-13, 2014. Godsey testified that he received a dispatch regarding a request for the homicide unit, and he

contacted homicide detectives (Detectives Phillips, Rasor, House, Schloss, and Via) and asked them to meet him at the scene. When Godsey arrived, he found that the scene had been secured and a crime scene log started; the detectives were already there, and Detective House was in the process of requesting a search warrant. One of the homicide detectives had already ordered Thompson-Shabazz to be transported to the Safety Building (Dayton police department) and placed in an interview room for questioning. Thompson-Shabazz's vest was removed by a uniformed officer.

{¶ 67} Detective Kevin Phillips became lead investigator. While Detective Phillips was in the bedroom with the victim, Detectives Rasor and Schloss were performing a canvas of the neighborhood, making contact with residents in the area. Other officers were looking in the alley, looking for additional evidence. Detectives House and Via searched the house. Blood was found in the bedroom where Gibson was found and in the upstairs bathroom, but no evidence was located elsewhere in the house or outside.

{¶ 68} At approximately 6:00 a.m. on July 14, Detective Phillips returned to the Safety Building, and he and Detective House made contact with Thompson-Shabazz in an interview room. They took photographs of the clothing that Thompson-Shabazz was wearing and of Thompson-Shabazz's hands; Thompson-Shabazz's hands showed no signs of recent injuries. After the detectives were informed that Thompson-Shabazz had also been wearing a vest, they viewed the vest and saw what they believed was dried blood on the back right portion of the vest and several spots on the front of the vest. Detective Phillips asked Officer Stiver to test the vest for the presence of blood; the field-test came back positive for blood.

{¶ 69} At 6:17 a.m., Detectives Phillips and House interviewed Thompson-

Shabazz. After Thompson-Shabazz waived his *Miranda* rights, he told the detectives that he last saw Gibson on the night he was released from jail and had not been in the house since Friday. Thompson-Shabazz stated that he slept on the porch Saturday night after being brought back to the residence by the police. He said that Gibson never opened the door. Thompson-Shabazz denied that he and Gibson had a physical fight and that he would and/or had hurt her. During the interview, Detective House noticed blood on Thompson-Shabazz's pants; Thompson-Shabazz denied that there was blood on his pants. Thompson-Shabazz stated that he was wearing his vest, slacks, and a t-shirt when he left the house, but had changed his clothes at a church at Fourth and Torrence Streets during the weekend; he specifically stated that he left his pants and shirt at the church and got new clothes there. The jury viewed a redacted version of the interview.

{¶ 70} After the interview concluded, Thompson-Shabazz was taken to the Montgomery County Jail. His clothing was removed, and it was returned to Detectives House and Phillips. Detective Phillips testified that he instructed uniformed officers to keep each item of clothing separate "to maintain the integrity of each garment." The detectives turned the clothing over to Officer Christoffers, an evidence technician.

{¶ 71} After the interview with Thompson-Shabazz (sometime after 7:30 a.m.), Detective Phillips returned to Gibson's residence and, with additional assistance from narcotics detectives, continued to search the scene. Several items were brought to Phillips's attention, including a bone fragment (taken to the Coroner's Office), a flip phone, and several claw hammers.

{¶ 72} Deputy Coroner Bryan Casto performed the autopsy on Gibson on Monday,

July 14, 2014, beginning at approximately 9:00 a.m.; Detective Rasor attended the autopsy and was in contact with Detective Phillips during the autopsy.

{¶ 73} At trial, Casto described Gibson's appearance as "markedly distorted" due to both trauma and decomposition. Casto testified that Gibson had injuries on "basically all surfaces of her head," including a large cavity on the right side due to numerous impacts to the same area. He stated that the cause of Gibson's death was multiple blunt- and sharp-force, chop-type injuries, which were caused by a "heavy weapon" with more than one patterned surface, at least one of which has a cutting edge. Possible weapons included a hatchet, an ax, or a "roofing hammer." Casto stated that the injuries caused by a household claw hammer would have looked different than Gibson's injuries. Casto noted that Gibson had a stent in a coronary artery, but he stated that she had "no other reason to be dead other than her trauma."

{¶ 74} Casto could not provide an exact time of death for Gibson, because bodies decompose at different rates depending on the environment; he agreed that Gibson's death could have been within a 36-hour to 48-hour timeframe.

{¶ 75} Detective Phillips testified that, as part of his investigation, he also looked to see if any calls for service relating to Gibson and Thompson-Shabazz were made near the time of the homicide. In addition to the July 9 call regarding the alleged theft by Thompson-Shabazz, Phillips testified about three calls for service that Gibson made to 333-COPS (2677), which is handled by the Regional Dispatch Center along with 911 calls. The calls were made on July 10, July 11, and July 12.

{¶ 76} Around noon on July 10 (Thursday) and around 12:15 a.m. on July 11 (Friday), Gibson reported that she was receiving threatening phone calls. Gibson told

the dispatcher that someone was threatening to rape her because her boyfriend owed the caller money. Gibson did not know the identity of the caller, but she provided the phone number that was being used to call her. Phillips, who heard a recording of the call, testified that Gibson had sounded "distraught."

{¶ 77} Phillips testified that he called the number from which the threatening calls were made and a male, later identified as Al-Maajid McCathron, answered the phone. Phillips told McCathron that he (Phillips) was investigating a homicide, that the detective had obtained McCathron's phone number from records regarding Gibson, and the detective asked McCathron to respond to the Safety Building the following day. McCathron indicated that two other young men – Brian Troutman and Devontae Morton -- were involved in the phone calls, and Phillips asked that those others also respond to the Safety Building. Detective Phillips interviewed the three separately, and they admitted to making prank phone calls due to a "past history" with Thompson-Shabazz. Phillips testified that at least four phone calls were made from McCathron's number to Gibson's number. During cross-examination, Phillips testified extensively about the calls from McCathron's phone to the phone used by both Gibson and Thompson-Shabazz, as well as calls from Gibson's and Thompson-Shabazz's phone to McCathron's number.

{¶ 78} Gibson's third call for service was made at 12:20 a.m. on Saturday, July 12. Gibson complained that Thompson-Shabazz had pushed his way into her home and was harassing her. She stated that Thompson-Shabazz had stolen her rent money. At the end of the call, Gibson declined to have police officers respond, because Thompson-Shabazz had left the residence, and Gibson stated that she would call back if Thompson-Shabazz returned.

{¶ 79} Detective Phillips testified that he followed-up on the information Thompson-Shabazz had given about obtaining clothing from a church at the corner of Fourth and Torrence Streets. Phillips was able to obtain statements from two individuals at the church, Pastor David Bonnell and James Robert Osborn.

{¶ 80} On July 15, 2014, Detective Phillips and Lieutenant Wendy Stiver met with Thompson-Shabazz at the jail and obtained his consent to search a cell phone that was found and to get a sample of his DNA. Thompson-Shabazz also gave the officers consent to search Gibson's residence again. Detective Phillips also testified that on July 16, 2014, he was contacted by Rita Harmon about an encounter she had with Thompson-Shabazz the previous Saturday (July 12, 2014).

{¶ 81} At trial, several police officers testified about their specific roles in the investigation. Officer Craig Stiver, an evidence technician, testified that he was called to the scene on the night of July 13 and photographed the interior and exterior of Gibson's home. Stiver did not find any signs of forced entry, and photographs showed that both the front and back doors had deadbolts. Another photograph showed that mail addressed to Gibson was in the mailbox. Several of Stiver's photographs showed the extensive amount of clutter in the house.

{¶ 82} Stiver photographed the bedroom where Gibson was found, noting blood spatter on the bedroom door, the walls, the headboard of the bed, a fan, the window and other items. Stiver testified that the blood on the walls appeared to be "cast-off," where the blood was transferred to the weapon and then the blood was "cast off" the weapon when it was "coming back up for another strike." Stiver stated that, from the appearance of the scene, he could tell that Gibson's head had been struck multiple times. Stiver also

located blood in the upstairs bathroom. Stiver collected blood samples from the bedroom and bathroom, as well as the trap from the sink, in case the perpetrator had washed his hands. Stiver testified that the officers searched the house for additional evidence, including a possible weapon; nothing was found.

{¶ 83} Stiver further testified that, after he left the scene, homicide detectives asked him to come to the Safety Building to test a vest to see if there were blood on it. Stiver swabbed a small area and performed a Hemident test for the presence of blood, which returned a positive result. Stiver packaged the vest and put it in the property room.

{¶ 84} Officer Ronald Christoffers, another evidence technician, testified that at 7:30 a.m. on July 14, he was dispatched to Gibson's residence at the request of Detectives House and Phillips. The detectives briefed him on what had occurred, he did a walk-through of the house, and the detectives told him what they wanted him to collect. Christoffers collected a small fragment of skull from the bedroom. In the upstairs bathroom, Christoffers swabbed the sink handles for DNA and the base of the sink where he saw blood. Christoffers put the skull fragment in a large slide box and gave it to Sergeant Godsey, who took the fragment directly to MVRCL; the coroner had asked for the fragment so that he could do a comparison to see if he could determine the type of instrument that might have been used in the homicide.

{¶ 85} Chistoffers testified that detectives and additional officers searched the property and the alleyway for the possible weapon; officers brought three claw hammers to Officer Christoffers, but none field-tested for the presence of blood. Christoffers was also provided a red cell phone to process. Later, Officer Christoffers was contacted by the homicide detectives to collect the clothing that Thompson-Shabazz was wearing.

Christoffers placed the clothing in a drying locker, and after the clothing dried, he put them in an evidence bag and put the bag in the property room.

{¶ 86} Sergeant Godsey testified about the supervisory role that he played in the investigation, including calling out homicide detectives to the scene upon the original report by Officer Dilley. Because Godsey's role was supervisory and support, Godsey was not directly involved in the search of Gibson's house or the collection of evidence. Godsey later returned to the Safety Building, and he observed the interview of Thompson-Shabazz. After the interview, Godsey and other officers returned to the scene to conduct a subsequent search; Godsey did not participate in the search. However, he took a slide box with a piece of bone, which he had gotten from Officer Christoffers, to the Coroner's Office.

{¶ 87} Emily Draper, a DNA forensic scientist at the Miami Valley Regional Crime Lab, testified that she received numerous samples, including known DNA samples from Thompson-Shabazz and Gibson. Draper found Gibson's blood in swabs from the upstairs sink of Gibson's house. A sample labeled "trace DNA for upstairs west bedroom/bathroom" revealed a mixture of DNA; Draper could not eliminate either Gibson or Thompson-Shabazz as contributors to the DNA mixture. The sample labeled "sample from the vest/jacket" matched Gibson's DNA profile.

{¶ 88} Draper also tested various items of clothing that MVRCL received from the police. Draper testified that there was no blood found on the socks and the shirt, but blood was found on the front of boxer shorts, the pants, the vest, and shoes. The major contributor of DNA found on the boxer shorts was Gibson; Draper could not identify the minor contributor. Blood on the back lower legs of the pants and the left shoe matched

Gibson; the blood on the right shoe was a partial profile, which matched Gibson at all locations found. Draper found "isolated stains" on the vest. The DNA analysis of the stain from the right shoulder of the vest revealed a mixed DNA profile with Gibson as the major contributor; Thompson-Shabazz was ruled out as being a contributor to the minor mixed profile. Other samples from the vest (front, left shoulder and center back) had a single DNA source, who was Gibson.

{¶ 89} McCathron, Troutman, and Morton, the individuals involved in the "prank" telephone calls, also testified at trial. McCathron testified that his friends, Troutman and Morton, were friendly with Thompson-Shabazz, but he (McCathron) did not know Thompson-Shabazz or Gibson. McCathron said that his friends called Thompson-Shabazz by the nickname "Cotton Candy." McCathron said that his friends dialed the phone, handed it to him, and he "started talking." McCathron remembered talking to a woman and being "aggressive," but he did not recall what he had said. McCathron testified that his friends had his phone for several days, and he knew that other calls were made. McCathron testified that, after he got his phone back, he received multiple calls from a man from a number he did not recognize; McCathron labeled the contact information for that number as "Don't Answer." McCathron testified that he did not go to Gibson's home on the night of July 11 to July 12, and he did not harm her.

{¶ 90} Troutman testified that he knew Thompson-Shabazz as "Cotton Candy" and also knew Gibson. Troutman indicated that he had Thompson-Shabazz's number, because he would loan Thompson-Shabazz money. Troutman said that, in July 2014, he was not mad at Thompson-Shabazz, and Thompson-Shabazz did not owe him (Troutman) money.

{¶ 91} Troutman testified that he, Morton, and McCathron decided to make prank phone calls to the phone used by Thompson-Shabazz and Gibson. They decided to use McCathron's phone, because Thompson-Shabazz and Gibson would recognize his (Troutman's) and Morton's phone numbers. Troutman stated that they decided to prank Thompson-Shabazz, just because Thompson-Shabazz was an "outgoing, funny person" and they were "trying just to get a kick out of him." Troutman did not remember what was said, but he denied that threats were made. Troutman testified that he liked Thompson-Shabazz and Gibson and did not intend to hurt Gibson in any way. Troutman denied that he and his friends went to Gibson's home on the night of July 11 to July 12.

{¶ 92} Morton also testified about the prank phone calls. His testimony was substantially similar to Troutman's testimony.

{¶ 93} Pastor David Bonnell and church volunteer James Robert Osborn testified about Thompson-Shabazz's presence at Eastview Baptist Church on July 12, 2014. Bonnell testified that he knew Thompson-Shabazz as "Cotton Candy" and that Thompson-Shabazz had come by the church on three or four occasions. Bonnell stated that the church has a food pantry twice a month, and Thompson-Shabazz would sometimes stop and talk while Bonnell was unloading food. Bonnell stated that, in conjunction with the food pantry, the church also has donated clothing for people to look through and take as needed.

{¶ 94} Bonnell saw Thompson-Shabazz on July 12, a food pantry/clothing drive day; Thompson-Shabazz came in around 9:30 or 9:45 a.m. wearing dark pants, a t-shirt, and a dark vest with Christian symbols. Bonnell was in the middle of conducting a paryer service and could not talk with Thompson-Shabazz at length, and he (Bonnell) asked a

volunteer, Osborn, to speak with him. Bonnell described Thompson-Shabazz's demeanor as "friendly enough" and "probably under the influence of something;" Thompson-Shabazz did not seem upset. Bonnell saw Thompson-Shabazz leave approximately 90 minutes later. Thompson-Shabazz left in the same clothing in which he had arrived; he had not gotten clothing from the clothing drive.

{¶ 95} Osborn testified that, on July 12, 2014, he was working in the kitchen at the church when Pastor Bonnell asked him to talk with someone, Thompson-Shabazz. Osborn stated that Thompson-Shabazz "was upset about something, something that had been bothering him. * * * He was distraught and not in his right mind, I guess." Osborn testified that he tried to find out what had happened and was causing Thompson-Shabazz emotional pain, but he was not able to find out. Osborn stated, "He [Thompson-Shabazz] had mentioned that he had lost his wife and child in a home invasion murder some years back, and that was weighing heavily on him. That seemed to be about the only specific thing that he mentioned that he was distraught over." Osborn stated that the two talked for "a couple hours" and Thompson-Shabazz left in the same clothes he had been wearing. Osborn described Thompson-Shabazz's clothing as a button-up shirt, dark pants, and a black vest with religious writing.

{¶ 96} Finally, Rita Harmon testified about her July 12 encounter with Thompson-Shabazz and her subsequent contact with the police. Harmon testified that she had known Thompson-Shabazz for 20 years; they had met through a mutual friend. Harmon was friendly with Thompson-Shabazz, but not friends.

{¶ 97} Harmon testified that on the evening of Saturday, July 12, she had encountered Thompson-Shabazz twice as she walked near the South Park

neighborhood. The first time, Harmon was walking to a friend's house with her son, and she saw but did not converse with Thompson-Shabazz. As she was on her way home with her son, Thompson-Shabazz approached her and asked her for a cigarette. Thompson-Shabazz indicated that he needed a cigarette because his wife had passed away. When Harmon expressed condolences and mentioned that she heard that his wife had been shot, Thompson-Shabazz responded, "No, not that one, the last one." When Harmon expressed that she needed to get home, Thompson-Shabazz indicated that he wanted to go with her, because he had nowhere to go. Harmon told Thompson-Shabazz that he could not go home with her.

{¶ 98} On Wednesday, July 16, 2014, after a report of Gibson's death appeared on the news, Harmon contacted the Dayton Police Department to report that she had encountered Thompson-Shabazz on July 12. Harmon testified, "[W]hen I seen them on the news, I got alarmed that he [Thompson-Shabazz] had told me the day before they found her body that she was deceased. He told me Saturday night."

{¶ 99} Thompson-Shabazz offered one defense witness, his sister, Lateefah Shabazz. She testified that Thompson-Shabazz was a slow learner and that he has been on Social Security since 2002, when his "wife" was murdered. She stated that the death affected Thompson-Shabazz "really bad to where he couldn't think straight." She indicated that, after the 2002 murder, Thompson-Shabazz was depressed and his balance and coordination were affected. Ms. Shabazz stated that her brother would "use a lot of metaphors," would not stay on topic when he talked, and would end up referring to the girlfriend who was murdered. She indicated that Thompson-Shabazz became a heavy drinker after that murder. With respect to Thompson-Shabazz's eyes, his sister

indicated that he was "a couple stages from being legally blind," that his eyes are not aligned, and that he may have broken his glasses.

**{¶ 100}** On cross-examination, Ms. Shabazz recognized that Thompson-Shabazz's drinking had been a problem between him and Gibson at times, but she stated that he would buy alcohol with his own income. Ms. Shabazz was not aware that Thompson-Shabazz had been arrested on a theft complaint shortly before Gibson's death.

**{¶ 101}** Upon review of the evidence at trial, Thompson-Shabazz's conviction is neither based on insufficient evidence nor against the manifest weight of the evidence. The State presented substantial circumstantial evidence that Thompson-Shabazz had been at Gibson's home beginning in the evening of Friday, July 11, 2014, that the two had argued throughout the evening, that Gibson was killed during the overnight hours of July 11 to July 12, and that Thompson-Shabazz was the only person who had been at Gibson's home until police officers entered the house during the nighttime hours of Sunday, July 13. Thompson-Shabazz's statement to Hanson, prior to the police officers' discovery of Gibson's body, reflected knowledge of her death. Gibson's blood was found on several items of Thompson-Shabazz's clothing, including the vest and pants he appeared to have been wearing all weekend. Although McCathron, Troutman, and Morton made threatening phone calls to Gibson shortly before her death, the jury could have reasonably concluded that those were prank phone calls and that the three men were not involved in Gibson's death.

**{¶ 102}** Thompson-Shabazz's first assignment of error is overruled.

**IV.**

{¶ 103} Thompson-Shabazz's third assignment of error challenges the admission of one of Gibson's calls to 333-COPS, specifically the call where she reported that he had stolen her money and was harassing her (State's Exhibit 102). He argues that the admission of the call violated his rights under the Confrontation Clause and that the call's probative value was substantially outweighed by the prejudice caused to him "by showing his prior bad acts to the jury."

{¶ 104} "[T]he [United States] Supreme Court has recognized that a defendant's Sixth Amendment right to confront witnesses against him is violated when an out-of-court statement that is testimonial in nature is admitted into evidence without the defendant having had the opportunity to cross-examine the declarant." *State v. Eicholtz*, 2d Dist. Clark No. 2012-CA-7, 2013-Ohio-302, ¶ 26, citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

> Testimonial statements include statements " 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *State v. Kelley*, 2d Dist. Clark No. 2011 CA 37, 2012-Ohio-1095, ¶ 58, quoting *Crawford* at 52. " '[S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' "

*Eicholtz* at ¶ 26, quoting *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), paragraph one of the syllabus.

*State v. Kerr*, 2d Dist. Montgomery No. 26686, 2016-Ohio-965, ¶ 22.

**{¶ 105}** The Sixth Amendment right to confrontation of witnesses does not extend to nontestimonial hearsay. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 13, citing *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 21. Evid.R. 803(1) permits the admission of a "present sense impression," which is defined as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Similarly, Evid.R. 803(2) excludes an excited utterance from the hearsay rule. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

**{¶ 106}** The excited utterance and present sense impression exceptions to the definition of hearsay reflect "an assumption that statements or perceptions that describe events uttered during or within a short time from the occurrence of the event are more trustworthy than statements not uttered at or near the time of the event. Moreover, 'the key to the statement's trustworthiness is the spontaneity of the statement, either contemporaneous with the event or immediately thereafter. By making the statement at the time of the event or shortly thereafter, the minimal lapse of time between the event and statement reflects an insufficient period to reflect on the event perceived — a fact which obviously detracts from the statement's trustworthiness.' " *State v. Travis*, 165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237, ¶ 35 (2d Dist.), quoting *State v.*

*Ellington*, 8th Dist. Cuyahoga No. 84014, 2004-Ohio-5036, ¶ 10.

{¶ 107} In keeping with this rationale, 911 calls are usually admissible under the excited utterance or the present sense impression exception to the hearsay rule. *E.g.*, *Ratliff v. Brannum*, 2d Dist. Greene No. 2008-CA-5, 2008-Ohio-6732, ¶ 132 (911 calls are admissible as excited utterances), citing *State v. Williams*, 2d Dist. Montgomery No. 20368, 2005-Ohio-213, ¶ 17; *State v. Jackson*, 2d Dist. Champaign No. 2004-CA-24, 2005-Ohio-6143, ¶ 15 (911 recording was properly admitted as a present sense impression). " 'The controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection.' " *State v. Crowley*, 2d Dist. Clark No. 2009 CA 65, 2009-Ohio-6689, quoting *State v. Humphries*, 79 Ohio App.3d 589, 598, 607 N.E.2d 921 (12th Dist.1992).

{¶ 108} Finally, relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).

{¶ 109} A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶

34.

{¶ 110} The parties stipulated that State's Exhibit 102 was a recording of a phone call made by Gibson to 333-COPS and received by the Regional Dispatch Center on July 12, 2014 (Saturday) at 12:20 a.m. The call lasted one minute and 54 seconds.

{¶ 111} After listening to the call (and other 333-COPS calls), the trial court found that the calls were excited utterances and that the calls were not testimonial. With respect to the testimonial nature of the July 12 call specifically, the trial court noted:

> * * * [The] Court would make a finding that the 911 call sought by the State is not testimonial; that is, a call indicating an ongoing event. The declarant says, "He's at my home. He's harassing me. He was not harassing me at first because he was outside." And, then, she then says, "He's gone now." And, once she says, "He's gone now," then the ongoing emergency has dissipated at that point.
>
> But so, in looking at whether or not the call is testimonial and the primary purpose of the call, the Trial Court determines that the primary purpose of the call was not to make a statement for purposes of formal legal proceedings but rather to respond to the issue at hand. So, with that, the fundamental ruling is all of the 911 calls come in.

{¶ 112} We have listened to Gibson's July 12 call to 333-COPS, and we find no abuse of discretion in the trial court's finding that Gibson's statements fell within a hearsay exception and that they were nontestimonial. As the trial court noted, the call begins with Gibson's complaint that Thompson-Shabazz is at her house and is harassing her. Gibson told the dispatcher that he had arrived "right before dark," but Gibson said that

Thompson-Shabazz "was not harassing [her] at first." About 90 seconds into the call, Gibson tells the dispatcher that "he's gone now. * * * [H]e just left." Although Gibson's voice sounded relatively calm, the trial court reasonably concluded that Gibson was reporting an ongoing upsetting event, which reasonably fell within the present sense impression exception to the hearsay rule, if not also the excited utterance exception. In addition, the trial court reasonably concluded that the primary purpose of Gibson's statements was to seek police assistance for an ongoing situation.

{¶ 113} Thompson-Shabazz's third assignment of error is overruled.

### V. Admission of Theft Complaint

{¶ 114} Thompson-Shabazz's fourth assignment of error states, "The trial court erred in allowing evidence of Gibson's theft report regarding the Appellant and his arrest for it." He argues that the trial court abused its discretion in finding that the evidence was probative of Thompson-Shabazz's motive. He states that the State "had evidence of motive from the neighbors' testimony of the argument between the Appellant and Gibson[;] it did not need to add prejudicial testimony of the theft, the Appellant's arrest and the recovery of the money order."

{¶ 115} Thompson-Shabazz objected to the introduction of evidence of Gibson's theft complaint at the beginning of Officer Gundelfinger's testimony and to evidence of his arrest on the theft complaint at the beginning of Officer Paxton's testimony.

{¶ 116} With respect to the theft report, the State responded that it was offering evidence of Gibson's complaint to explain why Gundelfinger issued a lock-up broadcast for Thompson-Shabazz, and Gibson's statements to Officer Gundelfinger were not being offered for the truth of the matter asserted. The trial court gave a limiting instruction that

Gibson's theft allegation was "not being offered for the truth of the matter asserted, but rather it's being offered for purposes of explaining the actions that Officer Gundelfinger took in response, so that his actions have a context for you to understand. So, a starting point for the steps that he took but no for whether or not that allegation was truthful. And so you have to use that evidence for that limited purpose only and for no other purpose."

{¶ 117} At the beginning of Officer Paxton's testimony, Thompson-Shabazz renewed his objection to the theft allegations against him. The trial court ruled that "the theft allegations that occurred shortly before the discovery of Ms. Gibson's body is relevant and falls under the 404(B) exception as to motive." Paxton then testified that he arrested Thompson-Shabazz on the theft complaint.

{¶ 118} Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Ohio Supreme Court has discussed Evid.R. 404, stating:

Evid.R. 404 codifies the common law with respect to evidence of other acts of wrongdoing. The rule contemplates acts that may or may not be similar to the crime at issue. If the other act is offered for some relevant purpose other than to show character and propensity to commit crime, such as one of the purposes in the listing, the other act may be admissible. Another consideration permitting the admission of certain other-acts evidence is whether the other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the

indictment" and are "inextricably related" to the crime.

(Citations omitted.) *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 13.

**{¶ 119}** Here, approximately two days before the murder, Gibson complained to the police that Thompson-Shabazz had stolen from her, and Thompson-Shabazz was arrested on that complaint the following day. Thompson-Shabazz was released from jail on July 11 and was heard arguing with Gibson later that day. Gibson appears to have been killed sometime during the early morning hours of July 12. Although the evidence of Gibson's theft allegation and Thompson-Shabazz's subsequent arrest cast Thompson-Shabazz in a negative light, it was highly relevant as to Thompson-Shabazz's possible motive for the murder. And, we cannot conclude that the evidence was unduly prejudicial to Thompson-Shabazz. The trial court did not abuse its discretion in allowing evidence of Gibson's theft complaint and Thompson-Shabazz's arrest on that complaint.

**{¶ 120}** Thompson-Shabazz's fourth assignment of error is overruled.

### VI. Conclusion

**{¶ 121}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.

Copies mailed to:

Heather N. Jans
Michael J. Scarpelli
William O. Cass, Jr.
Hon. Mary L. Wiseman