[Cite as *State v. Stanford*, 2023-Ohio-1515.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29544 |
| | : | |
| v. | : | Trial Court Case No. 2020 CR 03028 |
| | : | |
| DWAIN A. STANFORD | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on May 5, 2023

· · · · · · · · · · ·

MATHIAS H. HECK, JR., by RICKY L. MURRAY, Attorney for Appellee

JOHNNA M. SHIA, Attorney for Appellant

· · · · · · · · · · · ·

EPLEY, J.

{¶ 1} After a bench trial in the Montgomery County Court of Common Pleas, Dwain A. Stanford was found guilty of felonious assault of a peace officer, aggravated robbery, assault of a peace officer, and resisting arrest. After merging the assault offenses, the trial court sentenced him to a minimum of three years to a maximum of four and a half years in prison. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} The State's evidence at trial established the following facts. During the early afternoon on September 25, 2020, Stanford went to the home of his neighbor, Amanda Shelley. Shelley came downstairs and saw him talking to her children. Stanford told Shelley that they were "finally free and were going to be kings and queens." Stanford left, and Shelley's children followed him outside.

{¶ 3} Soon thereafter, George Garcia heard a lot of noise outside his home and looked out his upstairs window. He saw Stanford (who lived across the street), Stanford's son, and two neighborhood boys running through Stanford's yard, across the street, and up and down the street. Garcia thought Stanford was acting "very peculiar, very unusual." Stanford was "shouting at the top of his lungs" and behaving erratically; he also berated his son and slapped his son's head. Garcia had never seen Stanford act that way before. Concerned that Stanford's behavior would escalate, Garcia called the police. After providing information to the dispatcher, he hung up.

{¶ 4} Clayton Police Officers Matthew Deskins and Joseph Levangie – each in unform and in separate cruisers – were dispatched to a residence on Crownwood Avenue on a 911 hang-up call. Officer Deskins arrived first. As he existed his cruiser, he noticed a shirtless man (Stanford) near the rear of his vehicle. Stanford immediately punched the officer around his left eye. Deskins started bleeding, obscuring his vision, and the two were "just in a fight." As they wrestled, the officer realized that Stanford was fully naked.

{¶ 5} Stanford punched Officer Deskins and grabbed the neckline of his vest. The

officer tried to give Stanford commands to stop, but Stanford continued to fight. Stanford also called to his son to join the fray, and the son repeatedly punched the officer on the right side of his face. Officer Deskins attempted to retrieve his taser but was punched whenever he tried. When he finally got the taser out, it was knocked from his hand.

{¶ 6} Officer Deskins became afraid that, if he continued to take blows, he would be rendered unconscious and have his firearm taken. The officer pulled out his gun, which prompted Stanford's son to back away. Deskins pointed the gun at Stanford's stomach and chest area, and Stanford grabbed the firearm with "more than two fingers on the front of the barrel." Officer Deskins continued to give commands, saying "I'll shoot you, I'll shoot you." At that point, the officer was able to pry the firearm out of Stanford's fingers and get up. According to Deskins, Stanford was still on the ground trying to get up himself. When Stanford rose, Deskins ordered him to "back up, back up, back up."

{¶ 7} Shelley testified that she beckoned Stanford over to her, and she stood between Stanford and Officer Deskins. Shelley tried to calm down Stanford and let him know that he needed to let the police officer put handcuffs on him. Stanford told Shelley that she would "never be a queen with this mind frame."

{¶ 8} While Officer Levangie was en route to the scene, he heard Officer Deskins speak inaudibly over the radio and could tell Deskins was in distress. When Levangie arrived, he saw Officer Deskins standing beside his cruiser near the south side of Crownwood, holding his gun in a low ready position. Deskins was bleeding heavily from the left side of his face and eye area, was panting, and appeared confused or disoriented. When asked if he was okay, Deskins replied that he was "done." Stanford was standing

on the south side of Crownwood, holding onto Shelley. Stanford continued to yell at Officer Deskins.

{¶ 9} Officer Levangie got between Stanford and Deskins and told Stanford to get down. Instead of complying, Stanford clinched his fists, took an aggressive stance, and started toward Officer Levangie, saying "You're going to have to do something." Levangie took out his taser. As Stanford approached, the officer backed up, ordering Stanford to stop and "don't do this." When Levangie had backed up to the north side of the street, where a citizen was standing close by, he gave a final command for Stanford to stop; Stanford did not. The officer deployed his taser, which caused Stanford to drop to the ground.

{¶ 10} Officer Ashlee Shewman arrived on scene on a "99" (officer in trouble) dispatch and saw Stanford approach Officer Levangie aggressively and fall after being tased. She went to assist Officer Levangie in arresting Stanford. She kneeled on the back of Stanford's knees to prevent him from getting up and placed her taser against his back. Officer Levangie struggled to get control of Stanford's arms, which were tucked under Stanford's body. Both officers gave orders for Stanford to stop resisting. Eventually, Stanford was placed in handcuffs and put in a cruiser. Levangie asked medics to look at Stanford, but he continued to fight. Stanford later was taken to Miami Valley Hospital.

{¶ 11} Officer Deskins also went to the hospital, where he received stitches above his left eye. He had also suffered a concussion, a black right eye, and scrapes to his legs, knees, hands, elbow, and arms. At the time of trial, Deskins continued to have

migraines, dizziness, and nausea, which he had not experienced prior to the concussion.

{¶ 12} On October 13, 2020, Stanford was indicted for aggravated robbery, a felony of the first degree; felonious assault on a peace officer (serious harm), a felony of the first degree; assault on a peace officer, a felony of the fourth degree; and resisting arrest, a first-degree misdemeanor.

{¶ 13} Approximately two weeks later, Stanford's retained counsel filed a motion for a not guilty by reason of insanity (NGRI) finding and a competency evaluation. The trial court ordered a psychiatric examination by the Forensic Psychiatry Center for Western Ohio. Dr. Anthony Byrd conducted the evaluation, and his forensic report found that there were grounds to support a NGRI plea. At the State's request, the trial court ordered a second evaluation, which was also conducted by the Forensic Psychiatry Center for Western Ohio. The prosecutor told the court that the State wanted the second examiner to evaluate the issue of voluntary intoxication. In the second report, Dr. Carla Dreyer concluded that Stanford had a serious mental illness but did not meet the requirements for a NGRI plea. Given the conflicting reports, the court ordered a third examination. Dr. Scott Kidd, who was not associated with the Forensic Psychiatry Center, found that Stanford's symptoms when the offenses occurred "were most likely induced by the use of substances."

{¶ 14} In September 2021, the State filed a motion to exclude the trial testimony of Stanford's proposed expert, Robert Belloto, and requested a *Daubert* hearing. The trial court scheduled a hearing for November 12, 2021. However, on that date, the parties informed the court that they had reached a plea agreement. Under the terms of the

agreement, Stanford would plead no contest to the aggravated robbery and felonious assault charges, and the State would dismiss the remaining two counts. Stanford would receive community control with no local incarceration, and there would be a presumption that he would be supervised for the full five years. A presentence investigation would be conducted, during which Stanford would be evaluated for substance abuse and mental health treatment and he would be screened for the Veteran Treatment Court. The trial court conducted a plea hearing pursuant to Crim.R. 11, and Stanford pled no contest to the two first-degree felony charges, as agreed. Sentencing was scheduled for December 14, 2021.

{¶ 15} Nine days later, Stanford, with different counsel, moved to withdraw his no contest pleas, stating that his pleas had not been knowingly and intelligently made. At the hearing on the motion, defense counsel argued that pretrial motions to withdraw should be liberally granted, that Stanford had a meritorious defense (namely, that he was not guilty by reason of insanity), and that the State would not be prejudiced. The trial court granted the motion and permitted Stanford to enter a NGRI plea on all charges.

{¶ 16} On February 28, 2022, the trial court scheduled a final pretrial conference for June 21, 2022, and a jury trial for July 18, 2022. On July 14, 2022, the Thursday before trial, Sanford moved to continue the trial. The trial court denied the motion the next day. Counsel orally renewed the motion on Monday, July 18, before trial began, but the motion again was denied.

{¶ 17} After noting that Stanford had waived his right to a jury trial on July 15, 2022, the trial court conducted a bench trial as scheduled. Officers Deskins, Levangie, and

Shewman, as well as Garcia and Shelley, testified about the events of September 25, 2020. The State also presented photographs of Officer Deskins's injuries and cruiser videos, although little was captured by the vehicles' cameras. Drs. Dreyer and Kidd testified for the State regarding Stanford's NGRI defense. Stanford testified on his own behalf and offered the testimony of Dr. Byrd. The trial court found Stanford guilty of all four charged offenses and rejected his NGRI defense for each count. At sentencing, the trial court merged the assault charge into the felonious assault. It then sentenced Stanford to concurrent sentences totaling a minimum of three years and a maximum of four and a half years in prison.

{¶ 18} Stanford appeals from his conviction, raising four assignments of error.

## II. Motion to Continue the Trial

{¶ 19} In his first assignment of error, Stanford argues that the trial court abused its discretion in refusing to grant him a continuance of the trial. Stanford's trial counsel twice requested a continuance: on the Thursday before the trial and again on the morning of trial. Both requests were denied.

{¶ 20} We review the trial court's decision to deny a continuance for an abuse of discretion. *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 21} "In determining whether a trial court abused its discretion when ruling on a motion for continuance, a reviewing court must weigh any potential prejudice to the

defendant against the trial court's 'right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.' " *State v. Patton*, 2d Dist. Montgomery No. 23785, 2010-Ohio-5755, ¶ 19, quoting *Unger* at 67. "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *State v. Lawson*, 2020-Ohio-6852, 164 N.E.3d 1130, ¶ 26 (2d Dist.), quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).

**{¶ 22}** "The Supreme Court of Ohio has adopted a balancing test to guide lower courts in resolving the competing considerations when evaluating a motion for a continuance." *Lawson* at ¶ 24, citing *Unger* at 67. A trial court should consider (1) the length of the delay requested; (2) whether other continuances have been requested or received; (3) the inconvenience to the litigants, witnesses, opposing counsel, and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether defendant contributed to the circumstances which gave rise to the request for a continuance; and (6) other relevant factors, depending on the unique facts of each case. *Id.*

**{¶ 23}** Here, trial counsel entered his appearance on November 21, 2021, and the same day, he filed a motion to withdraw Stanford's plea. At the hearing on that motion, held on February 25, 2022, counsel indicated that Stanford had a meritorious defense "based on the bizarre set of facts, circumstances, and events that happened that day, and then based on some medical evidence that counsel was aware of." Upon allowing

Stanford to withdraw his plea, the trial court set a final pretrial conference for June 21, 2022, and trial for July 18, 2022.   Counsel had more than four months to prepare for trial.

{¶ 24} There is nothing in the record between March 1, 2022, and June 20, 2022, when defense subpoenas were issued and defense counsel filed his witness/evidence list.   The record does not reflect what was discussed at the final pretrial conference.

{¶ 25} On Thursday, July 14, 2022, Stanford moved to continue the trial date.   The motion cited four grounds: (1) defense counsel could not provide effective assistance if trial were to proceed; (2) this was defense counsel's first request for a continuance; (3) the State would not be prejudiced by a continuance; and (4) the motion was not a dilatory tactic.   In denying the motion, the trial court stated:

> A jury trial is set to begin on July 18, 2022.   This trial date was set on February 28, 2022 and was chosen to accommodate the calendars of counsel.   Since February 28, 2022, the State has requested multiple calls/conferences to discuss Defendant's expert witness(es), including Dr. Anthony Byrd.   Several months ago, the State represented its belief that Dr. Byrd would modify his opinion once he reviewed pertinent medical records.   Defendant has had ample time to prepare, to interview witnesses, and to retain experts.

{¶ 26} When asked before trial whether defense counsel had any pretrial issues that he wished to memorialize before proceeding, counsel responded that he wanted to "reiterate my request for a continuance of the trial in order to provide effective assistance of counsel."   In reply, the court stated:

And the record will reflect the renewal and the Court's denial of the request for a continuance would continue to stand. Based on the Court's calendar, it would be a substantial delay to reschedule the trial. The case is already extremely aged; it's incredibly past guidelines.

And the Court finds that there is not good cause to grant the continuance and so therefore, in the exercise of the Court's discretion for the management of its docket, as well as in the interest of justice, and there not being in the Court's evaluation a basis for the late request for a continuance, the request for a continuance would be denied.

Trial Tr. at 56.

{¶ 27} On the record before us, the trial court did not abuse its discretion in denying Stanford's motions for a continuance. Trial counsel was aware when he entered his appearance in November 2021 that the main issue at trial (if Stanford were permitted to withdraw his plea) would be his NGRI defense. After the motion to withdraw the plea was granted, trial was scheduled for July 18, 2022, approximately four months later. There is nothing in the record to suggest that defense counsel was having difficulty obtaining evidence for Stanford's defense, and counsel had adequate time to prepare for trial. Although the written motion for a continuance stated that counsel could not provide effective assistance if trial were to proceed on schedule, trial counsel did not provide any explanation for that statement.

{¶ 28} The written motion for a continuance was filed on the Thursday before the Monday trial date. Stanford apparently appeared in court on July 15, 2022, and waived

his right to a jury, but no transcript of that proceeding was prepared. The record is unclear whether the court denied the motion for a continuance before or after that hearing, and the record does not reflect whether the motion was discussed.

{¶ 29} Given that trial courts are given great deference in controlling their dockets and the public has an interest in the "prompt and efficient dispatch of justice," the trial court reasonably considered how long the case had been pending and the fact that a continuance would result in a substantial delay. The trial court was not required to accept counsel's statement that the motion was not a dilatory tactic. Defense counsel's requests for a continuance were made at the eleventh-hour and no basis for the request, other than a conclusory statement regarding effective assistance of counsel, was provided. The trial court's denial of Stanford's requests for a continuance was not unreasonable.

{¶ 30} Stanford's first assignment of error is overruled.

### III. Ineffective Assistance of Counsel

{¶ 31} Stanford's second assignment of error raises that trial counsel provided ineffective assistance in two respects. First, he argues that counsel acted deficiently when he moved to withdraw the negotiated no contest pleas. Second, Stanford asserts that counsel failed to properly prepare for trial and to present evidence in support of the NGRI defense.

{¶ 32} To establish ineffective assistance of counsel, a defendant must demonstrate both that (1) trial counsel's conduct was deficient, and (2) trial counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Lloyd*, Ohio Slip Opinion No. 2022-Ohio-4259, __ N.E.3d __, ¶ 15.

{¶ 33} Trial counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland* at 687; *Lloyd* at ¶ 16. The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland* at 687; *State v. Dennis*, 2d Dist. Montgomery No. 29266, 2022-Ohio-2888, ¶ 37. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

{¶ 34} The second prong requires a showing that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *Strickland* at 694; *Lloyd* at ¶ 18. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

{¶ 35} We cannot conclude that Stanford's trial counsel acted deficiently by filing a motion to withdraw Stanford's no contest pleas. Given Dr. Byrd's initial NGRI evaluation of Stanford, counsel had a reasonable basis for putting forth a NGRI defense if the motion were granted. Although Stanford ultimately was convicted of the offenses and received a sentence that was more stringent than agreed by the parties as part of the

plea agreement, we cannot use hindsight to conclude that Stanford's trial counsel acted deficiently in moving to withdraw the no contest pleas.

{¶ 36} In addition, Stanford's private conversations with his defense counsel are not before us, and the record does not clarify whether the motion was made at the suggestion of counsel or, alternatively, contrary to counsel's advice. A claim of ineffective assistance of counsel cannot be raised on direct appeal if it relies on evidence outside the record. *State v. Merrick*, 2d Dist. Greene No. 2019-CA-29, 2020-Ohio-3744, ¶ 34; *State v. Easterling*, 2019-Ohio-2470, 139 N.E.3d 497, ¶ 27 (2d Dist.). To the extent that Stanford's claim relies on communications with his attorney, it is not properly raised on direct appeal.

{¶ 37} Stanford further claims that his trial attorney did not adequately prepare for trial. On the morning of trial, counsel reiterated his request for a continuance of the trial so that he could provide effective assistance of counsel. However, counsel's cross-examination of the State's witnesses, particularly his lengthy examination of the State's two expert psychologists, belies Stanford's claims that his attorney was unprepared. In addition, Stanford presented his own defense expert psychologist, Dr. Byrd, who provided testimony in support of the NGRI defense.

{¶ 38} To the extent that Stanford's claim is based on counsel's failure to obtain additional evidence on his behalf and to present it at trial, the record does not reflect what additional evidence should have been presented. Because this claim relies on evidence outside the record, it is not properly before us.

{¶ 39} Stanford's second assignment of error is overruled.

## IV. Aggravated Robbery

{¶ 40} In his third assignment of error, Stanford claims that his conviction for aggravated robbery was based on insufficient evidence.

{¶ 41} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id*.

{¶ 42} Stanford was convicted of aggravated robbery, in violation of R.C. 2911.01(B). The statute provides:

No person, without privilege to do so, shall knowingly remove or attempt to remove a deadly weapon from the person of a law enforcement officer, or shall knowingly deprive or attempt to deprive a law enforcement officer of a deadly weapon, when both of the following apply:

(1) The law enforcement officer, at the time of the removal, attempted removal, deprivation, or attempted deprivation, is acting within the course and scope of the officer's duties;

(2) The offender knows or has reasonable cause to know that the law

enforcement officer is a law enforcement officer.

R.C. 2911.01(B).

{¶ 43} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "Culpable mental states are frequently demonstrated through circumstantial evidence." *State v. Hypes*, 2d Dist. Clark No. 2018-CA-110, 2019-Ohio-4096, ¶ 21, quoting *State v. Fox*, 2018-Ohio-501, 106 N.E.3d 224, ¶ 14 (10th Dist.). Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 49. In some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991). A defendant's state of mind may be inferred from the totality of the circumstances. *State v. Murphy*, 2d Dist. Montgomery No. 27802, 2018-Ohio-3506, ¶ 16.

{¶ 44} The State's evidence established that Officer Deskins drove to Crownwood Avenue on a report of a 911 hang-up call. He was in uniform and drove a marked police cruiser. Deskins was acting within the course of his duties, and the evidence reflects that Stanford knew (or certainly had reason to know) that Deskins was a law enforcement officer.

{¶ 45} According to Officer Deskins's testimony, Stanford began a physical altercation with Deskins as the officer was exiting his cruiser. The assault was

unprovoked and unexpected, and Stanford repeatedly grabbed, wrestled with, and punched the officer. Stanford did not respond to the officer's commands to stop; to the contrary, he instructed his son join in the assault. Officer Deskins tried several times, unsuccessfully, to retrieve his taser, and when he did so, it was knocked from his hand.

{¶ 46} Officer Deskins also testified about what occurred when he pulled out his gun. According to the officer, Stanford grabbed the firearm with one of his hands and had "more than two fingers on the front of the barrel." Trial Tr. at 68. The officer demonstrated for the court how Stanford had grabbed the gun. When Stanford "pulled forward," Officer Deskins pulled backward and was able to "pry" the gun free. Construing the evidence in the light most favorable to the State, the State produced sufficient evidence that Stanford had knowingly grabbed the gun to deprive Officer Deskins of his service weapon.

{¶ 47} On appeal, Stanford emphasizes that Officer Deskins conceded that, by grabbing the weapon, Stanford could have been trying to stop the officer from shooting him. However, such testimony relates to the purpose behind Stanford's actions, not how he touched the firearm and whether he knowingly attempted to deprive Officer Deskins of his gun.

{¶ 48} Stanford's third assignment of error is overruled.

### V. Not Guilty By Reason of Insanity Defense

{¶ 49} In his fourth assignment of error, Stanford claims that the weight of the evidence established that he was not guilty by reason of insanity.

{¶ 50} In contrast to the sufficiency of the evidence standard, "[a] weight of the

evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson,* 2d Dist. Montgomery No. 22581, 2009-Ohio-525, at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541, at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 51}** The defendant bears the burden of establishing the defense of not guilty by reason of insanity. *See* R.C. 2901.05(A). To meet this burden, the defendant must prove that "at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(14). The defense must be proven by a preponderance of the evidence. R.C. 2901.05(A); *State v. Cochran*, 2d Dist. Montgomery No. 27023, 2017-Ohio-216, ¶ 7. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting *Black's Law Dictionary* 1182 (6th

Ed.1998); *Cochran* at ¶ 7.

{¶ 52} Pursuant to R.C. 2901.21(E), "[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." "Intoxication" includes, but is not limited to, intoxication resulting from the ingestion of alcohol, a drug, or a combination of them. R.C. 2901.21(F)(4).

{¶ 53} The underlying facts of this case are not in dispute. (Stanford testified that he did not recall his encounter with the Clayton police officers.) The State's evidence at trial established that Stanford was acting erratically during the afternoon of September 25, 2020. Prior to Officer Deskins's arrival, Stanford told Shelley that they were finally free and were going to be kings and queens. Soon thereafter, Garcia observed Stanford running outside, shouting "at the top of his lungs," and behaving "very peculiar, very unusual." Worried that Stanford's erratic behavior would escalate, Garcia called the police. Stanford was naked when Officer Deskins arrived, and he immediately attacked the officer. He also acted aggressively toward Officer Levangie when that officer addressed him, and then resisted arrest.

{¶ 54} The primary focus at the bench trial was Stanford's mental state at the time of the offenses. Stanford asserted that his actions were the result of a several mental diseases that rendered him unable to appreciate the wrongfulness of his actions. In contrast, the State argued that Stanford had "some kind of mental status issue," but that he committed the crimes knowingly. It asserted that his conduct was due to substance intoxication, not a manifestation of his severe mental disease.

**A. Stanford's Evidence in Support of NGRI Defense**

{¶ 55} Stanford's evidence in support of his NGRI defense consisted of his own testimony and that of Dr. Byrd.

{¶ 56} Stanford was 53 years old at trial. He testified that he had been married twice and had nine children. His wife at the time of trial was the mother of seven of his children; they had been married for 23 years. Stanford stated that he had no criminal record.

{¶ 57} According to Stanford, he graduated high school in 1988 and joined the United States Air Force in 1989. He was stationed throughout the world during his career, with his final location at Wright Patterson Air Force Base. Stanford first experienced "mental status changes" around August 1991 after a deployment to Saudi Arabia, where he witnessed a beheading. He had received evaluations and treatment for mental health issues since then. Stanford received a medical retirement for chronic low back pain and some generative disc disease in 2005. He continued to work at the base as a civilian until July 2020, when he stopped working due to PTSD and major depressive disorder with psychotic features.

{¶ 58} Stanford testified that he did not remember the incident on September 25, 2020. He recalled throwing trash away in a dumpster because the family was preparing to move, and then he woke up in the Miami Valley Hospital (MVH) intensive care unit. Stanford denied taking drugs on September 25, 2020. He said he had last used marijuana around September 4, 2020, and took Tylenol 3 (acetaminophen with codeine) for his back. Stanford had been prescribed medications by Dayton Behavioral Health (DBH) – Abilify for psychosis, Doxazosin for nightmares, Lexapro for mood, and Prozasin

– but he had not taken them for two weeks prior to September 25, 2020. Stanford denied that he was using marijuana daily on September 4, 2020, and he denied telling Drs. Dreyer and Kidd that he did. He also denied taking his wife's Percocet; he explained that he had used his wife's Percocet in 2005 and told doctors about this as part of his medical history.

{¶ 59} Dr. Byrd conducted a forensic interview of Stanford and provided a report to the court in December 2020. When he made his assessment, Dr. Byrd knew only what Stanford told him and information from the police reports; he did not have Stanford's medical records. At that time, Dr. Byrd opined that Stanford had had an acute psychotic episode and met the definition of not guilty by reason of insanity, given the absence of psychosis-inducing voluntary drug consumption.

{¶ 60} Prior to the trial, Dr. Byrd reviewed the MVH records. He saw that Stanford had tested positive for THC (marijuana) and opiates; the toxicology results were negative for cathinones (bath salts). Dr. Byrd testified that he looked for something in Stanford's system that could cause psychosis and, in its absence, assumed a physiological (natural) cause. Dr. Byrd testified that the MVH records appeared to include "speculation" about Stanford's drug use.

{¶ 61} Dr. Byrd further testified that the MVH doctors noted "toxic metabolic encephalopathy" and then later "acute metabolic encephalopathy," which Dr. Byrd interpreted as "a little uncertain" about the cause of Stanford's symptoms. He explained: "So from my experience working in a hospital for 28 years, my experience would be that that suggests they don't know or that particular physician wasn't certain of a toxin and

perhaps because nothing was found, they were just simply trying to be accurate and said just acute encephalopathy, which is just a generalized derangement of the brain function."

{¶ 62} Dr. Byrd had never seen marijuana or Tylenol with opiates trigger psychosis.  He stated that stimulants can mimic paranoid psychosis and mania, and it would be difficult to know whether the symptoms were caused by a substance, in the absence of blood work.  When asked on cross-examination whether his NGRI opinion was same following his review of the medical records, Dr. Byrd responded, "Possibly" and he expressed that "it's a bit more convoluted now."   Asked if the records from MVH, DBH, and the Veterans Administration (VA) would change his opinion, Dr. Byrd replied, "Not necessarily" but "possibly."   Dr. Byrd did express that if Stanford had tested positive for an illegal narcotic, he would "have to go by what I understand of the law, which is that voluntary consumption of some intoxicant does not allow for one to present a not guilty by reason of insanity defense."   Dr. Byrd stated on cross-examination that he did not know of Stanford's positive test for an illegal narcotic when he made his report, but he testified on redirect examination that he knew Stanford had tested positive for marijuana and opiates.   Dr. Byrd ended his testimony by repeating his concern about the apparent absence of a psychosis-inducing drug: "Where's the drug?"

### B. Evidence Against the NGRI Defense

{¶ 63} At trial, defense counsel asked Officer Deskins on cross-examination whether he had seen any indicia of drug use by Stanford.   Deskins said he had not seen any drug paraphernalia, as Stanford was naked, but he testified that Stanford's sweating and nakedness were signs of excited delirium from psychedelics.   Officer Deskins's

opinion was based on a couple classes in college, where he earned a bachelor's degree in criminal justice, and from his police academy training. Deskins agreed that he was not a medical professional and did not know how an organic psychotic episode manifested.

{¶ 64} Two psychologists testified on behalf of the State: Dr. Dreyer and Dr. Kidd. Both psychologists found that Stanford had a severe mental disease. They noted that Stanford previously had been diagnosed with major depressive disorder with psychotic symptoms. Dr. Dreyer testified that Stanford's behavior at the time of the offenses was consistent with psychosis and mania. Both psychologists opined, however, that Stanford's symptoms on September 25, 2020, were likely due to substance intoxication, not due to his mental disorder.

{¶ 65} Dr. Dreyer performed Stanford's second NGRI evaluation. To assist in preparing her report, she had the police reports, Dr. Byrd's prior examination report and the information that went with his referral, information from Stanford's wife, information from Stanford, as well as patient records from DBH (Stanford's outpatient provider) and MVH (where he was taken after the incident). Dr. Dreyer noted that the MVH records from September 25, 2020 showed "he had been admitted for intoxication by drug uncomplicated * * * [and] that was identified as being the principal problem during the hospital admission." The records also showed that Stanford tested positive for opiates and marijuana, and hospital personnel had noted concerns about other potential drug use. Dr. Dreyer indicated that Stanford told her that he used marijuana daily, and he purchased those drugs illegally, i.e., other unknown substance could have been mixed

with the marijuana. Dr. Dreyer testified that marijuana itself could set off psychosis, although a person would need to smoke all day long to induce it. Dr. Dreyer stated that Stanford did not explain the opiates in his system.

{¶ 66} Dr. Dreyer also commented that the MVH records described how Stanford's symptoms had changed very quickly while he was in the hospital and what treatment he had received. She testified that while the length of psychotic episodes vary, it was "very, very rare" for a psychotic episode to be a short period of time; Stanford's psychotic episode had resolved rapidly. Dr. Dreyer testified that Dr. Lisa Cantor-Jacobson, who had conducted the psychological consultation at MVH, had concluded that, "[d]ue to the extremely acute onset, quick resolution, extreme agitation, fever, and tachycardia," the psychotic episode was likely due to bath salts (mixed cathinones), a type of stimulant. Dr. Cantor-Jacobson had further diagnosed Stanford with acute stimulant intoxication with delirium resolved, PTSD and cannabis use disorder. Dr. Dreyer acknowledged that she did not see a positive test for cathinones in the MVH records.

{¶ 67} Dr. Dreyer had reviewed Dr. Byrd's evaluation report but found that he did not use the statutory language for an NGRI opinion.

{¶ 68} Dr. Kidd, who conducted the third sanity evaluation, similarly reviewed police reports and witness statements, prior evaluation reports, and records from MVH and the VA. Kidd also had Stanford's records from DBH. Dr. Kidd stated that Stanford discussed his substance use and substance abuse treatment and told Dr. Kidd about flashbacks he had experienced. Dr. Kidd noted that the VA had diagnosed Stanford with major depressive disorder in 2017.

{¶ 69} Dr. Kidd testified about Stanford's visit to the VA on September 4, 2020, three weeks before the incident at issue. Stanford had reported feeling paranoid and presented to the hospital with significant aggressiveness and incoherent speech. The VA records showed that he was using marijuana daily then and there was some question about whether he was experiencing cannabis-induced psychosis. The VA doctor who took Stanford's history and conducted his physical wrote "acute encephalopathy [brain abnormality], likely secondary to acute withdrawal or acute intoxication secondary to unknown substance." Stanford ultimately was diagnosed with cannabis dependence with psychotic features and non-dependent opiate use. When Stanford was evaluated by a psychiatrist four days later, the doctor concluded the symptoms were due to substance abuse due to the "extremely acute onset" and "quick resolution" of Stanford's symptoms.

{¶ 70} Dr. Kidd testified that he did not believe Stanford's behavior on September 25, 2020, had been due to either flashbacks or depression. He explained that it was unusual for flashbacks to last even a few minutes and Stanford's unusual behavior was not consistent with a flashback. Dr. Kidd further stated that Stanford's level of aggressiveness, his unusual behavior, and the disorientation or confusion were not symptoms of major depressive disorder. Based on the September 4, 2020 VA records and the MVH records, including the toxicology results from MVH, Dr. Kidd found it most likely that Stanford had some type of substance-induced altered mental state. He concluded that Stanford had been suffering from a several mental disease at the time of the offenses, but his symptoms had been caused by an unknown substance.

**C. Analysis**

{¶ 71} Upon review of the evidence at trial, the trial court's rejection of Stanford's NGRI defense was not against the manifest weight of the evidence. There was substantial evidence from which the trial court could have concluded that Stanford suffered from a serious mental disease on September 25, 2020. Indeed, it appears undisputed that Stanford previously had been diagnosed with major depressive disorder with psychotic features and that he had been experiencing psychotic symptoms during his encounter with officers on September 25, 2020. However, Stanford was also required to establish that, *as a result of a severe mental disease*, he did not know the wrongfulness of his acts. Here, the trial court was presented with conflicting evidence as to whether his symptoms were the result of his mental disease or were the result of the consumption of a substance.

{¶ 72} Stanford argues on appeal that there was no credible evidence to prove that he had voluntarily ingested a psychosis-inducing drug. He emphasizes that Drs. Dreyer and Kidd could not identify a substance that induced Stanford's psychosis, and he remarks that the medical records were not admitted nor did the medical doctors whose opinions were referenced testify. Stanford also points to the testimony of Dr. Byrd, who found Stanford's presumed drug use by MVH physicians to be "mere speculation" because no specific drug was found in his system that would cause psychosis.

{¶ 73} The State's experts, however, testified that Stanford's symptoms were not consistent with naturally occurring psychosis, emphasizing that Stanford's psychotic symptoms had a rapid onset and a rapid resolution. Stanford's toxicology results at MVH

showed positive results for marijuana and opiates, and according to Dr. Dreyer, marijuana use alone could trigger a psychotic episode. Stanford told Dr. Dreyer that he had been using marijuana that was bought illegally. Stanford's medical records from the VA showed an emergency room visit on September 4, 2020 – three weeks before the incident here – where he was given a diagnosis of cannabis dependence with psychotic features. Doctors at MVH had believed that Stanford's symptoms had been induced by the ingestion of a substance.

**{¶ 74}** In reaching its verdict, the trial court, as the trier of fact, was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It was the province of the trial court to weigh the evidence and determine whether Stanford had proven, by a preponderance of the evidence, his NGRI affirmative defense. Based on the totality of the evidence, we cannot conclude that the jury lost its way in finding that the affirmative defense was not established. Although Drs. Dreyer and Kidd could not identify the substance that induced Stanford's psychosis, the trial court could have reasonably concluded, based on their testimony, that the course of his symptoms was not consistent with naturally-occurring psychosis. Stanford's conviction was not against the manifest weight of the evidence.

**{¶ 75}** Stanford's fourth assignment of error is overruled.

### VI. Conclusion

**{¶ 76}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and LEWIS, J., concur.