[Cite as *State v. Stapleton*, 2023-Ohio-3085.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29736 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 01204/2 |
| | : | |
| SIR DEWAYNE STAPLETON | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on September 1, 2023

. . . . . . . . . . .

MICHAEL MILLS, Attorney for Appellant

RICKY L. MURRAY, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Sir Dewayne Stapleton was convicted of two counts of aggravated robbery following his no contest plea in the Montgomery County Court of Common Pleas. Stapleton appeals from his convictions, claiming that the trial court erred in overruling his motion to suppress his statements made to law enforcement officers and that his attorney rendered ineffective assistance in failing to seek a competency evaluation. For the

following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} On April 22 and 23, 2022, Stapleton and another man were involved in two aggravated robberies on or near the University of Dayton campus. The Dayton police soon identified Stapleton as a suspect and began looking for him. Stapleton turned himself in on April 26, 2022, and he was taken by detectives to the downtown police station (the Safety Building), where he was interviewed for approximately 50 minutes.

{¶ 3} On May 5, 2022, Stapleton and a co-defendant were indicted on two counts of aggravated robbery (deadly weapon), felonies of the first degree. Stapleton moved to suppress the evidence against him, including the statements he made to detectives on April 26, any eyewitness identifications, and any physical evidence gathered as fruit of the wrongfully-obtained evidence. He argued that his statements had been obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and were made involuntarily.

{¶ 4} A suppression hearing on Stapleton's statements was held on July 12, 2022. The court heard testimony from Detective Anthony Sawmiller of the Dayton Police Department, a witness for the State, and Chauntey Washington, a case worker for Goodwill Easter Seals, who was called by the defense. The pre-interview *Miranda* waiver form and a video-recording of the April 26, 2022 interview were admitted into evidence. A second hearing was scheduled on the additional issues, but it appears that the hearing did not go forward.

{¶ 5} The trial court overruled the motion to suppress Stapleton's statements. In

a ten-page decision, the court concluded that Stapleton's waiver had been made knowingly, intelligently, and voluntarily, despite his claim that his lack of education and his intelligence level had prevented him from understanding his rights or the effect of the waiver. The court further concluded that Stapleton's statements had not been made involuntarily.

{¶ 6} Approximately five months later, Stapleton pled no contest to both aggravated robbery counts. As part of the plea, he agreed to pay restitution and have no contact with the victims. After a presentence investigation, the trial court sentenced him to concurrent sentences totaling three to four and a half years in prison. It also ordered him to pay restitution of $483.60 and $518.45 to the two victims, jointly and severally with his co-defendant. The court waived court costs.

{¶ 7} Stapleton appeals from his convictions, raising two assignments of error. He challenges the trial court's denial of his motion to suppress and his trial attorney's failure to seek a competency evaluation for him.

**II. Motion to Suppress**

{¶ 8} In his first assignment of error, Stapleton claims that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights on April 26, 2022. "Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues." *State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 30; *see also, e.g., State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996). Stapleton does not challenge the trial court's conclusion that his statements were made voluntarily.

{¶ 9} An appeal from a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 15 (2d Dist.). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.). As a result, we must accept the trial court's findings of fact if they are supported by competent and credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, quoting *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13. The trial court's application of law to the findings of fact is subject to a de novo standard of review. *State v. Shepherd*, 2d Dist. Montgomery No. 29123, 2021-Ohio-4230, ¶ 10.

### A. Evidence Presented at the Suppression Hearing

{¶ 10} Detective Sawmiller's testimony and the video-recording of the April 26, 2022 interview established the following facts.

{¶ 11} On April 26, 2022, two detectives from the Dayton Police Department brought Stapleton to the Safety Building in downtown Dayton after Stapleton expressed a desire to give himself up to the police. Stapleton initially was placed in a holding cell.

{¶ 12} At approximately 3:20 p.m., Detective Sawmiller of the Violent Offender Unit brought Stapleton into an interview room with a desk and three chairs. Stapleton sat in the corner beside the desk; Sawmiller sat a few feet away at the desk and led the interview. Detective Harry Swaggert from the University of Dayton Police Department

sat by the door and assisted with some questioning.

{¶ 13} Detective Sawmiller began the interview by asking Stapleton how old he was. Stapleton indicated that he had just turned 18 years old. When asked if he had had his rights previously read to him, Stapleton said that he had but did not remember when, just "a long time ago." The detective then obtained identifying information from Stapleton: his name, birthdate, and home address. Sawmiller wrote the information on a waiver of rights form. Stapleton did not know his Social Security number.

{¶ 14} Stapleton told the detective that he had completed ninth grade and had had no additional schooling. Detective Sawmiller then asked Stapleton if he understood the term "learning disabilities." When Stapleton responded that he did not understand, Sawmiller asked if he had difficulty reading. Stapleton said that he could read "some" and understood what he read "half the time." He nodded affirmatively when Sawmiller asked if he understood what others read to him.

{¶ 15} Stapleton further indicated that he did not work, that he had eaten that day, and that he had not taken any drugs.

{¶ 16} Detective Sawmiller began to review the pre-interview *Miranda* waiver form with Stapleton. The detective told Stapleton that he would need to initial on the "hashmarks" to show that he understood what the detective had read to him. When Stapleton motioned to begin initialing, Sawmiller stopped him and said that he (Sawmiller) needed to read the statements first. Detective Sawmiller first read that Stapleton was being interviewed regarding the crime of aggravated robbery. He then read Stapleton's first *Miranda* right. The detective asked Stapleton if he understood, and Stapleton

nodded affirmatively. Sawmiller had Stapleton initial next to the first right. They proceeded similarly with the additional four statements of Stapleton's *Miranda* rights.

{¶ 17} Detective Sawmiller asked Stapleton to try to read the "waiver of rights" paragraph on the form. Stapleton shook his head, indicating that he could not. After confirming that Stapleton had completed ninth grade, the detective read the waiver paragraph to him. Sawmiller asked if Stapleton understood the word "coercion" and then explained that he would not trick Stapleton or threaten him to force him to do something he did not want to do. After Stapleton indicated that he understood, the detective had him sign the pre-interview form.

{¶ 18} Detective Sawmiller then asked Stapleton if he wanted to talk to them. As noted by the trial court, Stapleton's response was unintelligible. The detective explained to Stapleton that "somebody alleged a crime against you" and that, before the detectives could talk to him, Stapleton had "to say yes or no." Stapleton replied, "Yeah." Sawmiller clarified, "You want to talk to us?" Stapleton again responded affirmatively.

{¶ 19} For the next 43 minutes or so, Detective Sawmiller and, to a lesser degree, Detective Swaggert questioned Stapleton about the events surrounding the aggravated robberies near the University of Dayton. The trial court summarized the interview, stating:

> Det. Sawmiller began questioning Defendant about the events at issue in the case. Some questions Defendant answered appropriately; other times, Defendant asked why he was asking him questions; and sometimes Defendant just stared at Det. Sawmiller in response to the

questions. Defendant initially seemed hesitant to answer any questions that would incriminate his co-defendant, but when Det. Sawmiller began making statements about knowledge already gained from his co-defendant, Defendant became somewhat more forthcoming with his answers. At one point, he said "I was just following; he was the leader." Several times when the detective would phrase a question, "did you guys…," Defendant would clarify "he" did whatever was being asked, referring to his co-defendant, appearing to distance himself from any criminal acts.

At times, Defendant provided a narrative of events. When he did this, the response was appropriate and the narrative made sense. At other times, Defendant would not give any verbal or nonverbal response to the officers' questions. The second detective in the room tended to ask compound questions that were more difficult to answer, and Defendant often did not respond at all, other than to just look at him. At one point in the interview, the detectives asked Defendant if he knew the whereabouts of a female they believe was involved in a separate burglary of a gun. Defendant said it wouldn't help his case to tell them anything about her. Throughout the interview, Defendant occasionally asked questions about the various topics of discussion. However, Defendant consistently, throughout the interview, downplayed his role in all of the events at issue. At no point during the interview did Defendant ask to stop or ask for an attorney.

{¶ 20} Chauntey Washington testified at the suppression hearing that she had worked with Stapleton as a case manager with the Lifeline re-entry program at Goodwill Easter Seals beginning in January 2022. Washington explained that the program works with young adults in the judicial system, assisting them with obtaining education and employment, making referrals for mental health services, and "just helping them stay out of trouble." Washington indicated that she met with Stapleton one-on-one once or twice per week. She had assisted him with obtaining a state identification card and getting back into school.

{¶ 21} Washington testified that she "had to explain stuff to [Stapleton] thoroughly" and would need to complete forms for him because "the comprehension wasn't all the way there." She clarified that even when she explained it, he did not understand. Washington stated that she had received Stapleton's educational records, which showed that he had an individualized educational plan (IEP) and received all failing grades. The IEP was for "a learning disability, just he wasn't comprehending." When asked if Stapleton understood when she read forms to him, Washington responded, "Some of it, but not for the most part."

## B. Validity of Stapleton's *Miranda* Waiver

{¶ 22} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself or herself. To ensure that this constitutional right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda* have been followed. *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21.

*Miranda* held that prior to questioning, a suspect "must be warned that he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed." *In re M.H.*, 163 Ohio St.3d 93, 2020-Ohio-5485, 168 N.E.3d 439, ¶ 18, quoting *Miranda* at 444. Custodial interrogation occurs when an officer, by words or action, seeks information from a suspect that he knows is reasonably likely to be incriminating. *Rhode Island v. Innis*, 446 U.S. 291, 300-301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. Thompson-Shabazz*, 2017-Ohio-7434, 96 N.E.3d 1146, ¶ 17 (2d Dist.).

{¶ 23} A suspect may effectively waive his or her *Miranda* rights only if the waiver is made voluntarily, knowingly, and intelligently. *State v. Dailey*, 53 Ohio St.3d 88, 91, 559 N.E.2d 459 (1990), citing *Miranda* at 444. The waiver of *Miranda* rights is valid only if (1) the waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and (2) the person had "a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *State v. Marejka*, 2d Dist. Montgomery No. 27662, 2018-Ohio-2570, ¶ 14.

{¶ 24} Courts examine the totality of the circumstances to determine whether a suspect has knowingly, intelligently, and voluntarily waived his or her *Miranda* rights. *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988); *State v. White*, 2018-Ohio-3076, 118 N.E.3d 410, ¶ 17 (2d Dist.). "By definition of 'totality,' a court is to look to *all* of the evidence to determine a suspect's understanding, which can be implied by

his conduct and the situation." (Emphasis sic.) *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 9. Similar to determining whether the pretrial statement was involuntary, relevant factors regarding the *Miranda* waiver may include the suspect's background and criminal experience; age, education, and intelligence; the length, intensity, and frequency of the interrogation; the existence of deprivation, mistreatment, threat, or inducement; and any other factor deemed by the court to be relevant. *E.g.*, *Lather* at ¶ 9; *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 35. When the suspect is a juvenile, the totality of circumstances includes the capacity to understand the warnings, the nature of the Fifth Amendment rights, and the consequences of waiving those rights, as well as the access to advice from a parent, guardian, or custodian. *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 24.

{¶ 25} "[D]eficient intelligence is but one factor in the totality of the circumstances that must be considered in determining the voluntariness of a waiver." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 190. "A defendant's mental condition may be a 'significant factor in the "voluntariness" calculus. * * * But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness." ' " *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 113, quoting *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 26} No express written or oral waiver of *Miranda* rights is required. *North*

*Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Dillon*, 2016-Ohio-1561, 63 N.E.3d 712, ¶ 59 (2d Dist). "Instead, waiver can be inferred where a defendant proceeds to speak after being advised of his rights and indicating an understanding of them." *Dillon* at ¶ 59; *see Berghuis v. Thompkins*, 560 U.S. 370, 388-389, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) ("a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police").

{¶ 27} The State bears the burden of proving a knowing, voluntary, and intelligent waiver of *Miranda* rights. *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 100. "Evidence of a written waiver form signed by the accused is strong proof that the waiver was valid." *State v. Dennis*, 79 Ohio St.3d 421, 425, 683 N.E.2d 1096 (1997).

{¶ 28} Upon review of the suppression hearing evidence, the trial court did not err in denying Stapleton's motion to suppress the statements he made during his police interview. Stapleton was 18 years old and had some previous experience with the criminal justice system. Washington confirmed that she began working with Stapleton when he "got out of juvenile," and she was in contact with his probation officer. Stapleton indicated that he had previously been informed of his *Miranda* rights, albeit a "long time ago."

{¶ 29} Before informing Stapleton of his *Miranda* rights, Detective Sawmiller inquired about Stapleton's reading and comprehension abilities. Sawmiller learned from him that he had a limited ability to read and understand what he read; Washington's

testimony reinforced that Stapleton had a significant difficulty reading and completing forms himself. Stapleton indicated to Detective Sawmiller, however, that he understood what was read to him. The detective read the pre-interview form to Stapleton in its entirety, stopping after each right to ask if Stapleton understood it. Stapleton expressed that he did, and he followed the detective's instruction to initial on the line beside each right. The detective also read the waiver of rights paragraph to Stapleton, explaining what "coercion" meant. Stapleton signed the form and orally expressed that he wanted to speak with the detectives.

{¶ 30} There was no evidence that Stapleton was coerced into waiving his *Miranda* rights, nor that the detectives otherwise engaged in any improper behavior to induce the waiver. The detectives spoke with Stapleton for approximately an hour (including the review of the pre-interview form) in a conversational manner.

{¶ 31} Although the record supports a conclusion that Stapleton has learning disabilities and could not read the pre-interview form, his answers to the detectives' questions did not indicate that Stapleton had been unable to validly waive his *Miranda* rights. The trial court found "most compelling" Stapleton's conduct throughout the interview, stating:

> While at times Defendant would simply stare at whichever detective asked him the question, this often happened when his response could potentially incriminate him or his co-defendant. Defendant was careful on multiple occasions to distinguish the acts of himself and his co-defendant in response to the detectives' questions. He also redirected the detectives

when their questions assumed a fact that may not have been true. Occasionally, Defendant even said to the detectives that answering certain questions (usually about other people) would not help his case in any way.

While Defendant likely does have some cognitive deficits, he did not exhibit them to the detectives to the extent they would not have believed his waiver was knowing and intelligent. * * *

We agree with the trial court's assessment. Although Stapleton may have some cognitive deficits, the record reflects that Stapleton's waiver of his *Miranda* rights was knowing, intelligent, and voluntary.

{¶ 32} Stapleton's first assignment of error is overruled.

### III. Ineffective Assistance of Counsel

{¶ 33} In his second assignment of error, Stapleton claims that his trial counsel rendered ineffective assistance by failing to seek a competency evaluation. He argues that an evaluation was necessary to properly challenge the *Miranda* warnings in this case.

{¶ 34} To establish ineffective assistance of counsel, a defendant must demonstrate both that (1) trial counsel's conduct was deficient, and (2) trial counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Lloyd*, Ohio Slip Opinion No. 2022-Ohio-4259, __ N.E.3d __, ¶ 15.

{¶ 35} Trial counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland* at 687; *Lloyd* at ¶ 16. The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment." *Strickland* at 687; *State v. Dennis*, 2d Dist. Montgomery No. 29266, 2022-Ohio-2888, ¶ 37. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

{¶ 36} The second prong requires a showing that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *Strickland* at 694; *Lloyd* at ¶ 18. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

{¶ 37} A claim of ineffective assistance of counsel cannot be raised on direct appeal if it relies on evidence outside the record. *E.g.*, *State v. Stanford*, 2d Dist. Montgomery No. 29544, 2023-Ohio-1515, ¶ 36; *State v. Merrick*, 2d Dist. Greene No. 2019-CA-29, 2020-Ohio-3744, ¶ 34.

{¶ 38} Although there was some evidence in the record that Stapleton may have had cognitive deficits, the record did not contain the results of a mental evaluation. Consequently, we can only speculate whether a mental evaluation would have supported Stapleton's claim that he was unable to knowingly, intelligently, and voluntarily waive his *Miranda* rights. On this record, Stapleton cannot establish that he was prejudiced by his attorney's failure to obtain a mental evaluation of him. Rather, his argument necessarily

relies on information outside of the record. Stapleton's claim that his trial counsel rendered ineffective assistance by failing to obtain an evaluation is not properly raised on direct appeal.

**{¶ 39}** Stapleton's second assignment of error is overruled.

### IV. Conclusion

**{¶ 40}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and LEWIS, J., concur.